## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **BOULDER FALCON, LLC, a Utah limited liability company,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ROBERT BROWN, an individual; and IFLYAJET, INC., a Georgia corporation,**<br><br>**Defendants,**<br><br>**v.**<br><br>**BOULDER FALCON, LLC, a Utah limited liability company; BOULDER VENTURES DEVELOPMENT, INC., a Utah corporation; and JEFFREY M. VITEK, an individual,**<br><br>**Counterclaim Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br><br>**Case No. 2:22-cv-00042-JNP-JCB**<br><br><br><br>**District Judge Jill N. Parrish**<br><br>**Magistrate Judge Jared C. Bennett** |

District Judge Jill N. Parrish referred this case to Magistrate Judge Jared C. Bennett under

28 U.S.C. § 636(b)(1)(A).[1] Before the court are Defendants Robert Brown and IFLYAJET, Inc.'s

(collectively, "Defendants") motion for sanctions[2] and Plaintiff Boulder Falcon, LLC's

("Boulder Falcon") motion for a protective order,[3] both of which stem from the early termination

---

[1] ECF No. 8.

[2] ECF No. 66.

[3] ECF No. 70.

of the November 17, 2022 deposition of Jeffrey M. Vitek ("Mr. Vitek"), President of Boulder

Falcon. After reviewing the parties' respective memoranda, their exhibits, oral argument on the

parties' motions, the deposition transcript, and the video deposition itself, the court denies

Defendants' motion for sanctions and grants Boulder Falcon's motion for a protective order

because Defendants' counsel, Louis R. Cohan ("Mr. Cohan"), conducted Mr. Vitek's deposition

in bad faith. Additionally, because Mr. Cohan's conduct improperly frustrated the fair

examination of Mr. Vitek, the court also imposes sanctions.

**INTRODUCTION**

A civil litigator's job is to wade into the middle of a pre-existing conflict between two or

more parties. Sometimes wading into the conflict between the litigating parties fully immerses

the litigators. Over the years of being a civil litigator who was swimming in someone else's

conflict while trying to avoid drowning in it, I benefited from a book entitled *Crucial

Conversations: Tools for Talking When Stakes are High*.[4] In this book, the authors present a

model that accurately describes how individuals, including civil litigators, go from observing a

phenomenon to reacting to it. The model the authors present is shown below:[5]



See or hear---------> Brain tells a story---------> Feel an emotion----------> Take action
an event                                            from story

---

[4] Kerry Patterson et al., *Crucial Conversations: Tools for Talking When Stakes are High* (McGraw-Hill 2002).

[5] *Id.* at 99.

The authors discuss how the second step in the path to action is often where things go awry because when those embroiled in a pre-existing conflict see their "enemy" do something, the other side generally ascribes sinister motives to those actions even though those same actions may have several innocent explanations. Once armed with the story of sinister motives, the observer's brain feels an emotion that is generally negative. High on negative emotion, the observer then acts to right the perceived wrong that the enemy has perpetrated.

Although this single path to action is fraught with problems by itself, those problems compound because the action that a party took to right the perceived sinister wrong serves as the beginning point of the "other side's" path to action. The other side now undergoes the same process ascribing unkind motives, feeling a negative emotion, and reacting accordingly. Pretty soon, the parties' respective paths to action keep chasing each other into a spiraling race to the bottom of civility. Sadly, once the parties reach incivility's rocky bottom, each bruised and battered party figuratively looks up and blames the other side for getting them into this mess while simultaneously feeling justified for every civility foul that party committed all the way down the spiral's declining trajectory.

That is exactly what happened here. In the Factual Background section below, the court describes Mr. Cohan's path to action followed by Mr. Bryon J. Benevento's ("Mr. Benevento") (Boulder Falcon's counsel). Following this factual explanation, the court applies Fed. R. Civ. P. 30 to the respective paths to action and shows that the deposition was justifiably stopped for being taken in bad faith. After that analysis, the court rectifies the problems created by the parties' paths to action by imposing sanctions that protect justice and seek to restore civility.

## FACTUAL BACKGROUND

### I.   Mr. Cohan's Path to Action

Mr. Cohan's path to action did not begin at Mr. Vitek's deposition. It began earlier when he received Boulder Falcon's response to Defendants' Requests for Production of Documents under Fed. R. Civ. P. 34. Once Mr. Cohan saw Boulder Falcon's format for its document production, he assumed the worst, had an emotional reaction, and decided to act based on the wrong he perceived Boulder Falcon was trying to underhandedly perpetrate. Each step in Mr. Cohan's path to action is described below.

### A.  What Mr. Cohan Saw

Boulder Falcon responded to Defendants' Rule 34 requests by producing approximately 7,000 pages of materials in an electronic, load-file format so that they could be uploaded into discovery review software.[6] A "load file" is actually several files that work together to "load and organize information within e-discovery software so that the documents may be viewed, searched[,] and filtered."[7] Each "load file" contains a raw image of each document and other files containing metadata associated with each raw image.[8] When all the files in a load file are uploaded into discovery review software, the load file "ties all the information together within

---

[6] ECF No. 77 at 232:25 to 233:1; 265:11-12, 20-22. When referring to ECF No. 77, which is a sealed, complete transcript of Mr. Vitek's deposition, the court will reference the page(s) of the deposition itself with its corresponding line numbers. Unfortunately, the deposition page numbers are two pages off the page numbers in the .pdf version, which makes the hyperlinks two pages off.

[7] https://percipient.co/load-file/ (last visited Mar. 8, 2023); *see also* The Sedona Conference, *The Sedona Conference Glossary: Ediscovery & Digital Information Management, Fifth Edition, A Project of the Sedona Conference Technology Resource Panel*, 21 Sedona Conf. J. 263, 332 (2020) (defining "load file").

[8] https://percipient.co/load-file/ (last visited Mar. 8, 2023).

the software by connecting the image files to the right text and metadata files."[9] Thus, a full load file makes the raw image come "alive" by making all links in an email attachment become easily accessible with a mouse click just as they would be if they were being viewed on the email recipient's computer. Thus, in the language of Rule 34, load files allow a party to produce electronically stored information "in a form . . . in which it is ordinarily maintained."[10]

However, if discovery review software is not used to unlock the power of these load files, then the reviewer of the data is left with a bunch of seemingly extraneous files and raw images of the documents.[11] The raw images of the scanned documents contain no metadata, which means that what you see is what you get. In other words, all links to email attachments are not active, and the attachments to each email may not directly follow their parent email in the production. This means that an email and its attachment may be several hundred pages apart in the production. To understate the point, making sense of the documents becomes extremely difficult.

Although Boulder Falcon produced load files, it did not inform Defendants of that fact, and Defendants did not upload the load files into discovery review software. Consequently, to Mr. Cohan, Boulder Falcon's production appeared to be a randomized, unorganized, and duplicative mess. The links in emails to attachments did not work, and email attachments did not necessarily follow their parent email in the production. Indeed, as Mr. Cohan expressed with some frustration regarding Boulder Falcon's production of documents during Mr. Vitek's

---

[9] *Id.*

[10] Fed. R. Civ. P. 34(b)(2)(E)(ii).

[11] https://percipient.co/load-file/ (last visited Mar. 8, 2023).

deposition, "Looks like somebody threw [the documents] up in the air and put them together."[12]
That is an apt description of how a load-file document production appears without the aid of
discovery review software.

     B.  <u>Mr. Cohan's Story, Emotion, and Consequent Actions</u>

Upon seeing what appeared to be the haphazard, unorganized, and duplicative format of
Boulder Falcon's document production, Mr. Cohan concluded that Boulder Falcon and its
counsel had willfully committed the unprofessional and odious discovery foul of providing a
"document dump."[13] Seeing no innocent explanation for this conduct, Mr. Cohan obviously felt
some negative emotions against Boulder Falcon and its attorneys—which will become quite
apparent later—and acted by noticing the deposition of Mr. Vitek to, among other things, "make
a record" of Boulder Falcon's purported abuse of Rule 34.[14]

Before proceeding to Mr. Cohan's actions in the deposition, however, pausing to mention
what the Federal Rules of Civil Procedure and this District's local rules required of Mr. Cohan is
necessary. Before any party files a motion for protective order or a motion to compel, the Federal
Rules of Civil Procedure require the parties to meet and "confer."[15] Moreover, DUCivR
37-1(a)(2) requires a disgruntled discovery recipient to, "[a]t a minimum," provide "a prompt

---

[12] ECF No. 77 at 217:21-22.

[13] ECF No. 77 at 233:8-9; 262:16-18 (Mr. Cohan referring to Boulder Falcon's production of documents as a "document dump").

[14] During oral argument on the instant motions, Defendants' counsel stated that the deposition was to "make a record" of Boulder Falcon's noncompliance with Rule 34. Also, during the deposition, Mr. Cohan was expressing his dissatisfaction with the form that Boulder Falcon had produced documents and then said, "Part of what I'm doing is making a record of this bad conduct, because we are going to address it." ECF No. 77 at 267:1-3.

[15] Fed. R. Civ. P. 26(c), 37(a)(1).

written communication" to the producing party "specifying why [the discovery] responses or objections are inadequate, and . . . requesting to meet and confer." If no resolution occurs, DUCivR 37-1(b)(2)(C) requires the party seeking relief to file a motion with the court to address the discovery conflict "no later than 45 days after the prompt written communication in section 37-1(a)(2) was sent to opposing counsel." But none of this happened because Mr. Cohan's path to action was to "make a record" by taking Mr. Vitek's deposition. Consequently, the court now turns to Mr. Vitek's deposition, in which Mr. Cohan: (1) made several argumentative statements and questions, (2) asked questions without a good faith basis, and (3) scrolled through Boulder Falcon's document production in roughly sequential order[16] to prove the point that he had received a document dump. Each characteristic of Mr. Vitek's deposition is discussed below.

     1.  <u>Argumentative Questions and Statements</u>

The November 17, 2022 Zoom deposition was off to an inauspicious start when Mr. Cohan laid the "ground rules" for Mr. Vitek as follows:

> **Mr. Cohan**: Okay. In the course of the deposition today I am going to ask you a lot of questions. Each time I ask you a question, you might be thinking, "How do I answer this question?"
>
> And I want you to keep in mind as you do that, that as you're making those choices about how to answer questions, you might be choosing between do I evade? Do I parry? Do I dodge? Do I avoid? Do I do something other than answer the question?
>
> We will have a record of all of that, and if you do it, I will argue that in court to a judge and/or a jury at the appropriate time.
>
> Do you understand that?[17]

---

[16] ECF No. 76 at 3 (acknowledging that Defendants were "discussing documents in sequential Bates Number order" during Mr. Vitek's deposition).

[17] ECF No. 77 at 7:9-21.

This prompted Mr. Benevento to object.[18] Starting a deposition by bluntly ascribing that a witness is going to be evasive certainly is not consistent with Utah's Standards of Civility and Professionalism with which Mr. Cohan has agreed to comply as pro hac vice counsel.[19]

Continuing with his earlier warnings, Mr. Cohan later asked whether Mr. Vitek had ever seen someone get impeached with their prior testimony in arbitration or during trial, which was apropos of nothing in terms of the questioning at the time.[20] Thereafter, in response to Mr. Vitek's answer with which Mr. Cohan was dissatisfied, Mr. Cohan asked Mr. Vitek if he remembered being told "about dodging, evading, parrying, [and] avoiding," to which the witness expressed offense.[21]

At another point in the deposition, Mr. Vitek stated that he was unaware of a fact, to which Mr. Cohan stated, "I'm going to show you later where you did [know of the fact]."[22] Mr. Vitek reaffirmed that he had no recollection of the fact, which prompted Mr. Cohan to ask, "If I show you, you'll say, okay, I just didn't remember it, right?"[23] Mr. Vitek replied, "Perhaps," and Mr. Cohan followed up with, "You have to say 'I made a mistake, I didn't remember'?"[24] When

---

[18] ECF No. 77 at 7:22-23.

[19] Utah Standards of Professionalism and Civility Nos. 1, 3; ECF No. 21-1 at 2 (Mr. Cohan agrees to comply with the Utah Standards of Professionalism and Civility).

[20] ECF No. 77 at 35:5-21.

[21] ECF No. 77 at 215:20 to 216:7.

[22] ECF No. 77 at 60:22-25 to 61:1-2.

[23] ECF No. 77 at 61:3-5.

[24] ECF No. 77 at 61:6-10.

read in context, Mr. Cohan was clearly implying that Mr. Vitek was attempting to then and would continue to later obfuscate the facts.[25]

Besides presuming that Mr. Vitek was going to be evasive, Mr. Cohan repeatedly argued with Mr. Vitek. For example:

> **Mr. Cohan**: For better or worse, you've had some notoriety for litigation. Been involved in some litigation before this case, right?
>
> . . . .
>
> **Mr. Vitek**: I don't know about notoriety, but I've been involved in litigation.
>
> **Mr. Cohan**: Well, I found you on the Internet, so I'm going to say you've had some notoriety.[26]

Thereafter, while discussing how use of the airplane at issue in this action was scheduled, Mr. Vitek stated that he did not know if he still had access to the scheduling software and that he never used it before.[27] This prompted Mr. Cohan to say, "I mean, that's how the plane was scheduled and everybody knew who had access to the plane on dates and when it was available. Did you know that?"[28] That garnered an objection from Mr. Benevento.[29]

A little later on, Mr. Cohan asked Mr. Vitek if he was aware how far behind he was in paying his bills to Defendants.[30] Mr. Vitek responded that he was unaware that he was "behind at

---

[25] ECF No. 77 at 60:22 to 61:10.

[26] ECF No. 77 at 27:9-17.

[27] ECF No. 77 at 73:15-17.

[28] ECF No. 77 at 73:18-21.

[29] ECF No. 77 at 73:22.

[30] ECF No. 77 at 82:14-15.

all" on his payments.[31] Mr. Cohan then asked whether Mr. Vitek knew that he "owed almost $400,000 at that point."[32] To which Mr. Vitek said, "that's what you allege," then Mr. Cohan followed with the statement: "And that's what the unpaid bills reflect."[33] Depositions are opportunities to ask a witness questions and not to debate the witnesses answers.

Along those same lines, Mr. Cohan engaged Mr. Vitek further by asking, "Due upon receipt. Do you understand those words?"[34] To which Mr. Vitek said, "I do."[35] Mr. Cohan then said, "Okay. So that would be get the bill, look at it, make sure it's right, and send the payment, right?"[36] Mr. Vitek responded, "If that's your definition of due on receipt, I'll accept it."[37] To which Mr. Cohan followed, "Not store up weeks or months of bills and then say 'I can't understand what's going on here so I'm not paying any of them'? . . . . That's what you did, right?"[38] Mr. Cohan then continued, "And then right after IFLYAJET started pressing in December for payment is when you come up with this dispute in January and then filed a lawsuit, right?"[39] Such argumentative questions would never stand at trial.

---

[31] ECF No. 77 at 82:16.

[32] ECF No. 77 at 82:17-18.

[33] ECF No. 77 at 82:22-23.

[34] ECF No. 77 at 84:22-23.

[35] ECF No. 77 at 84:24.

[36] ECF No. 77 at 84:25 to 85:1-2.

[37] ECF No. 77 at 85:4-5.

[38] ECF No. 77 at 85:6-12.

[39] ECF No. 77 at 85:18-21.

Subsequently, Mr. Cohan discussed a payment of $130,000 with Mr. Vitek.[40] Mr. Vitek testified that he did not "sen[d]" the $130,000 to Defendants but "wired" it.[41] To which, Mr. Cohan responded, "Or wired, *as if that makes you a good guy and acting in good faith*, but you're not talking about the $350,000 that you owed and didn't send?"[42] Gratuitous editorializing in an argumentative question would also not stand at trial.

Well into the deposition, Mr. Vitek voiced his unfamiliarity with a particular months-old invoice. Mr. Cohan then asked, "As we sit here today, we're asking you questions about the lawsuit that you filed. You do understand that right?"[43] In context, this sarcastic question was arguing that Mr. Vitek was ignorant about his own lawsuit.

On this same theme, Mr. Vitek stated that he was not familiar with a particular invoice, but he was aware that errors on Defendants' invoices were a chronic problem.[44] Mr. Cohan responded, "Well, so you say."[45] Arguing with a witness is bad form.

After discussing an invoice from November 2021, Mr. Cohan began querying Mr. Vitek about another invoice from January 2022.[46] The following exchange occurred:

>    **Mr. Cohan**: Direct your attention to Boulder 562. Do you see that?
>
>    **Mr. Vitek**: I do.

---

[40] ECF No. 77 at 148:18-23.

[41] ECF No. 77 at 148:20.

[42] ECF No. 77 at 148:21-23 (emphasis added).

[43] ECF No. 77 at 170:7-9.

[44] ECF No. 77 at 194:7-9.

[45] ECF No. 77 at 194:10.

[46] ECF No. 77 at 216:23 to 217:22.

> **Mr. Cohan**: And this is an invoice from Kristen Bekins [i.e., Boulder Falcon's employee] to Eliza [i.e., Defendants' employee] on January 19, 2022. Do you see that?
>
> **Mr. Vitek**: Now we're back in January.
>
> **Mr. Cohan**: Of 2022.
>
> **Mr. Vitek**: You said, November, right?
>
> **Mr. Cohan**: You'll notice I'm going in the order in which these documents were produced to me and --
>
> **Mr. Vitek**: And I'm just merely clarifying the chronology.
>
> **Mr. Cohan**: Looks like somebody threw them [i.e., the documents in Boulder Falcon's production] up in the air and put them together.[47]

This editorial comment that has no place in either a deposition or at trial.[48]

After Mr. Vitek testified about his frustration with what he perceived to be the purported deficiencies in Defendants' billing accuracy, Mr. Cohan argued with Mr. Vitek by stating, "You

---

[47] ECF No. 77 at 217:8-22.

[48] Lamentably, Mr. Cohan's argumentative editorial regarding the document production, garnered a heated response from Mr. Benevento.

> Object to the form. Object to the statement. Object to the unprofessionalism. And object to this continued deposition if we're going to go down this path where you're constantly criticizing, implying motive, violating our rules.
>
> And if it keeps up, I'm just going to suspend and we'll just get an order from the judge that you do the rest of the deposition in front of him.

ECF No. 77 at 217:23 to 218:7.

keep saying that, but I haven't seen any documents about that."[49] Mr. Cohan's argument with Mr.

Vitek's answer set off another unfortunate exchange between counsel:

> **Mr. Benevento**: Well, that's a misstatement of the record as well. You have showed him 15 credit memos which are errors. You are -- you are just unabashed with the record. Unbelievable. It misstates the record. Argument. Lacks foundation.
>
> **Mr. Cohan**: Mr. Benevento, I have to say your ad hominem commentary is completely unprofessional and inappropriate.
>
> **Mr. Benevento**: Your -- Your --
>
> **Mr. Cohan**: You've been doing it all day.
>
> **Mr. Benevento**: Your misstatement of the record that there's no documents and he hasn't seen anything when you went through five credit memos is unprofessional and borders on unethical.
>
> **Mr. Cohan**: Were those payments or credits?
>
> **Mr. Benvento**: No, they're billing errors by Eliza [i.e., Defendants' employee] where it says you guys [i.e., Boulder Falcon] are right, let me send you a credit.
>
> **Mr. Cohan**: Did you see any of that?
>
> **Mr. Benevento**: Yes, you showed it to him.
>
> **Mr. Cohan**: Okay. Good -- good for you.
>
> **Mr. Benevento**: Exhibits --
>
> **Mr. Cohan**: No, I know what credit memos are. Okay. So let's stop making the same speech.[50]

---

[49] ECF No. 77 at 224:10-17.

[50] ECF No. 77 at 224:18 to 225:19.

Shortly thereafter, Mr. Vitek answered a question about when he became unhappy with Defendant Robert Brown's management of the disputed airplane.[51] Mr. Vitek's answer alleged that Mr. Brown took the airplane and "flipped it" (i.e., "sold it") to two others.[52] After Mr. Vitek's answer, Mr. Cohan argued, "Mr. Vitek, the truth of the matter is, Bob didn't flip the airplane. He didn't own it."[53] Mr. Benevento then accurately stated: "That's not a question."[54] Deposing counsel should save closing argument for trial.

A few minutes later, Mr. Cohan asked Mr. Vitek about a March 14, 2020 invoice.[55] Mr. Vitek was unsure when Boulder Falcon received that invoice or whether any proof to establish the amount due accompanied the invoice.[56] Mr. Cohan flatly accused, "*You're throwing that out there and sort of muddying the waters*, but there's nothing to indicate that the March 14th invoices weren't received on March 14, 2020?"[57] The question mark that the court reporter included at the end of this statement is generous. The end punctuation should have been a period. Such an argumentative "question" would be stricken at trial.[58]

---

[51] ECF No. 77 at 228:2-12.

[52] ECF No. 77 at 228:4-12.

[53] ECF No. 77 at 228:15-16.

[54] ECF No. 77 at 228:17.

[55] ECF No. 77 at 245:9-12.

[56] ECF No. 77 at 245:14-20.

[57] ECF No. 77 at 245:21-24 (emphasis added).

[58] Unfortunately, this was not an exhaustive list of Mr. Cohan's argumentative questions and statements.

2.   Questions Lacking a Good Faith Basis

Amidst the above-mentioned argumentative exchanges, Mr. Cohan set out to "make a record" of Boulder Falcon's document dump. For example, Mr. Cohan proceeded by showing Mr. Vitek documents one-by-one following (more or less) the Bates-number sequence of the production. Mr. Cohan did not provide discrete exhibits for Mr. Vitek to review. Instead, Mr. Cohan showed a page of Boulder Falcon's document production on the shared screen over Zoom, would ask Mr. Vitek questions about that particular Bates-numbered document, and then move to the next document.

A large portion of the documents shown to Mr. Vitek were invoices from Defendants to Boulder Falcon. A typical exchange regarding these invoices started with Mr. Cohan showing Mr. Vitek a months-old invoice. Mr. Cohan would then ask Mr. Vitek whether he disputes anything on the invoice. Mr. Vitek would then say that he is not sure if he ever disputed anything on the invoice and would then say that he would not know if anything on the invoice was amiss because his accounting staff handled all disputes on the invoices.[59] This type of "do you dispute anything on this invoice" questioning occurred on approximately 33 different invoices.[60]

However, mixed in with the "do you dispute anything" questions regarding these 33 invoices, Mr. Cohan's questions changed to why Boulder Falcon "didn't pay" the invoice, whether Boulder Falcon "shouldn't have to pay" the invoice, "do you owe them money," or

---

[59] *See, e.g.*, ECF No. 77 at 167:1 to 168:18.

[60] ECF No. 77 at 155:12, 20-21; 158:7-8; 162:18-19; 163:25 to 164:1; 165:25 to 166:1; 167:10-11; 171:7-8; 172:5; 172:23, 25 to 173:1; 174:17; 176:12; 176:25 to 177:1; 178:22-23; 180:10-11; 181:8-9; 182:3; 183:11; 184:2; 195:8-9; 197:17-18; 198:1-2; 198:20-21 & 199:2-3; 206:9-10; 207:1-2; 208:25; 212:8; 217:2-3; 219:7; 236:10-11; 236:23-24 & 237:1; 239:8-9; 252:5-6; 257:3.

whether Mr. Vitek "could have paid the invoice if he wanted to."[61] Each of these questions either expressly represented that Boulder Falcon had not paid the invoice or strongly insinuated that Boulder Falcon never paid the invoice. By illustration:

> **Mr. Cohan**: Let's take a look at Boulder 37 [i.e., Bates number in document production].
>
> **Mr. Vitek**: Okay.
>
> **Mr. Cohan**: And you see there's an invoice from IFLYAJET for May 1, 2021? See where my cursor is?
>
> **Mr. Vitek**: I do.
>
> **Mr. Cohan**: And the amount is $41,338.40. Do you see that?
>
> **Mr. Vitek**: I do.
>
> **Mr. Cohan**: Can you tell me what about this is disputed?
>
> **Mr. Vitek**: As we sit here, I can't tell you what, if anything, was disputed.
>
> **Mr. Cohan**: *Do you know why you didn't pay that?*
>
> **Mr. Vitek**: I don't know if I didn't pay it.
>
> **Mr. Cohan**: *Well, let's assume you didn't pay it. Do you know of any reason why?*
>
> **Mr. Benevento**: Object to the form.

---

[61] ECF No. 77 at 155:24 to 156:7 (discussing Bates number Boulder 37); 157:2 to 158:15 (discussing Bates number Boulder 39); 158:16 to 161:8 (discussing Bates number Boulder 41); 162:10 to 163:17 (discussing Bates number Boulder 43); 164:11-20 (discussing Bates number Boulder 46); 164:21 to 165:15 (discussing Bates number Boulder 47); 170:17 to 172:6 (discussing Bates number Boulder 64); 194:15 to 195:22 (discussing Bates number Boulder 106); 203:16 to 204:19 (discussing Bates number Boulder 346); 204:20 to 205:18 (discussing Bates number Boulder 356); 205:19 to 206:11 (discussing Bates number Boulder 403); 235:3-17 (discussing Bates number Boulder 663); 235:18 to 236:1 (discussing Bates number Boulder 670, 672); 254:19 to 255:12 (discussing Bates number Boulder 765).

>      **Mr. Vitek**: Ask the question again, please.
>
>      **Mr. Cohan**: *Do you know of any reason why you didn't pay that?*[62]

These types of questions occurred on 14 invoices wholly apart from the 33 invoices mentioned above. On 9 of these 14 invoices, Mr. Cohan's questions also asked Mr. Vitek whether he disputed anything about them in a similar manner to the 33 invoices mentioned above.[63]

       Despite Mr. Cohan's direct accusation or strong implication that Boulder Falcon did not pay the above-mentioned 14 invoices, Defendants' own accounting documents told a different story on at least 7 of the 14 invoices.[64] For example, regarding the above-quoted discussion regarding Bates number Boulder 37 (i.e., invoice 4682), Defendants' own accounting records show that Boulder Falcon paid it on June 4, 2021, which was over one full year *before* Mr. Cohan took Mr. Vitek's deposition.[65] Six other invoices in which Mr. Cohan directly accused or strongly insinuated that Boulder Falcon had not paid were likewise paid over a year before Mr.

---

[62] ECF No. 77 at 155:12 to 156:7 (emphasis added).

[63] ECF No. 77 at 155:24 to 156:7 (discussing Bates number Boulder 37); 157:2 to 158:15 (discussing Bates number Boulder 39); 158:16 to 161:8 (discussing Bates number Boulder 41); 162:10 to 163:17 (discussing Bates number Boulder 43); 164:21 to 165:15 (discussing Bates number Boulder 47); 170:17 to 171:10 (discussing Bates number Boulder 64); 194:15 to 195:22 (discussing Bates number Boulder 106); 235:18 to 236:1 (discussing Bates number Boulder 670, 672); 254:19 to 255:12 (discussing Bates number Boulder 765).

[64] The court does not have Defendants' complete accounting records. The one page "Boulder Falcon Statement" from Defendants that the court received as an exhibit in ECF No. 71-5 shows that Boulder Falcon had paid 7 of the 14 invoices referenced above at the time of the deposition. ECF No. 71-5 at 2 of 2. Therefore, it is possible that the other 7 could have been paid, but the court has no way to know based on the information provided. Therefore, the court assumes that Mr. Cohan had a good faith basis to ask the questions he did regarding the other 7 invoices.

[65] ECF No. 71-5 at 2 of 2 (showing invoice 4682 on the Boulder Falcon Statement was for $41,335.40 on May 1, 2021 (even though ECF No. 71-4 at 2 of 4 shows the invoice for $41,338.40) and a payment from Boulder Falcon for $41,335.40 being made on June 4, 2021).

Cohan deposed Mr. Vitek.[66] Knowing this information was not contingent upon Boulder Falcon's

document production but on Defendants' own accounting records.

### 3.   The Rolling, Scrolling Presentation of Documents

As Mr. Cohan accurately pointed out as he went through the above-referenced invoices

more or less in Bates-number order, the invoices were not numbered according to chronological

order.[67] And just before Mr. Vitek's deposition was terminated, this theme of the seemingly

haphazard nature of Boulder Falcon's document production continued to a new topic: email

correspondence between the parties. To provide context for the deposition excerpt below, Mr.

Cohan began asking Mr. Vitek about email correspondence between Boulder Falcon's employee,

---

[66] *Compare* ECF No. 77 at 157:2 to 158:15 (asking twice why Boulder Falcon did not pay invoice 4925 in the amount of $38,911.57), *with* ECF No. 71-5 at 2 of 2 (showing that the *actual* amount for invoice 4925 was $38,908.57 and was paid on July 14, 2021); ECF No. 77 at 158:16 to 161:7 (asking three times why Boulder Falcon did not pay invoice 5089 in the amount of $15,486.25), *with* ECF No. 71-5 at 2 of 2 (showing that the *actual* amount of invoice 5089 was $15,483.25 and was paid on October 13, 2021); ECF No. 77 at 203:16 to 204:19 (asking, "Did you pay for it?" and, "Do you owe them money?" twice for invoice 5218 in the amount of $5,407.25), *with* ECF No. 71-5 at 2 of 2 (showing that the *actual* amount for invoice 5218 was $5,404.75 and was paid on October 13, 2021); ECF No. 77 at 235:3 to 235:17 (asking, "Do you know of any reason why you shouldn't pay for [invoice 5051 in the amount of $16,289.06]?"), *with* ECF No. 71-5 at 2 of 2 (showing that the *actual* amount for invoice 5051 was $16,286.06 and was paid on September 2, 2021); ECF No. 77 at 235:18 to 236:1 (asking, "Do you know any reason why you shouldn't pay for [invoice 4508 in the amount of $5,514.31]?"), *with* ECF No. 71-5 at 2 of 2 (showing that invoice 4508 was *actually* for $5,511.31 and was paid on June 11, 2021); ECF No. 77 at 254:15 to 255:8 (asking, "Do you see anything that looks out of line there?" and, "Do you know of any reason why you shouldn't have to pay [invoice 4459 in the amount of $15,259.35]?"), *with* ECF No. 71-5 at 2 of 2 (showing that the *actual* amount for invoice 4459 was $15,256.35 and was paid on June 11, 2021).

[67] ECF No. 77 at 217:8-22 (discussing invoices that followed each other in Bates numbers but were several months apart, and Mr. Cohan said, "You'll notice I'm going in the order in which these documents were produced to me . . . . Looks like somebody threw them up in the air and put them together.").

Tammy Sill ("Ms. Sill"), and Defendants' employee, Eliza Brown ("Ms. Brown"),[68] regarding

questions that Ms. Sill was asking Ms. Brown about certain invoices from Defendants. At this

point, Mr. Cohan had reached Bates number Boulder 711. Here is how this exchange proceeded:

> **Mr. Cohan**: And [Ms. Sill] says, "Hi [Ms. Brown], [Mr. Vitek] has a few questions. Attached are the invoices and questions." Do you see that?

> **Mr. Vitek**: I do.

> **Mr. Cohan**: And then --

> **Mr. Vitek**: Do you have the invoice with the questions?

> **Mr. Cohan**: Well, I was about to tell you. So you'll see this is Boulder 711, right?

> **Mr. Vitek**: Yeah.

> **Mr. Cohan**: Okay. And remember this is your production to us. So what I have is what comes next[:] 712. Do you see any questions on that?

> **Mr. Vitek**: I don't.

> **Mr. Cohan**: And then I have 7 - -- Page 713. Do you see any questions on that?

> **Mr. Vitek**: I don't.

> **Mr. Cohan**: And then I have page 714. Do you see any questions on that?

> **Mr. Vitek**: No.

---

[68] ECF No. 71-6 at 2 of 20 (showing an email between Ms. Brown, whose email address ends with @iflyajet.com, and Ms. Sill).

> **Mr. Cohan**: And then I have Page 715. Do you see any questions on that?
>
> **Mr. Vitek**: I do not.[69]

Mr. Cohan then asked these same questions about each sequential document in Boulder Falcon's production until he got to Boulder 725.[70] Then Mr. Cohan asked, "So do you know if those [i.e., Boulder 712 to 725] are the invoices that were referenced in the email [i.e., invoices containing Ms. Sill's questions]."[71] Mr. Vitek said that he did not know, but that if Ms. Sill said she sent questions, then she probably did.[72] Mr. Cohan then asked Mr. Vitek if Ms. Sill had sent her questions to Ms. Brown, whether Ms. Sill would have a record (electronic or in paper) of her questions to Ms. Brown.[73] Mr. Vitek said that he would expect her to have retained such records but is unsure whether it would be in an email or handwritten notes on an invoice.[74] Mr. Cohan then asked: "And so that -- that's how your documents would be kept in the normal course of business, right?"—thus furthering his "record" that Boulder Falcon's document production violated Rule 34—to which, Mr. Vitek answered, "Yes."[75]

Mr. Cohan then began asking similar questions about attachments to emails that Mr. Vitek's staff had sent to Defendants' staff but did not appear to be adjacent to the parent email.[76]

---

[69] ECF No. 77 at 246:19 to 247:16.

[70] ECF No. 77 at 247:17 to 248:20.

[71] ECF No. 77 at 248:21-22.

[72] ECF No. 77 at 248:23 to 249:3.

[73] ECF No. 77 at 249:4-8.

[74] ECF No. 77 at 249:9-17.

[75] ECF No. 77 at 249:18-21.

[76] ECF No. 77 at 249:22 to 251:16.

Mr. Cohan then proceeded with the Bates-number order of Boulder Falcon's document production to inquire about some invoices,[77] some other email correspondence,[78] an invoice packet the contents of which were reviewed in Bates-number order,[79] and, finally, invoice 2883, which was Boulder 802 in Boulder Falcon's document production.[80]

As Mr. Cohan began his inquiries regarding the date of the invoice also being the payment due date,[81] Mr. Vitek asked if Mr. Cohan could scroll back up on the document, which was being shared on a computer screen over Zoom, so that Mr. Vitek could review it.[82] At this point, Mr. Benevento interjected that Mr. Cohan "doesn't want you to see the transmittal date."[83] Mr. Cohan moved to strike Mr. Benevento's comment as "obnoxious [and] inappropriate."[84] Mr. Benevento then accused Mr. Cohan of misleading the witness and called off the deposition because Mr. Cohan: (1) "just flip[ped] through [the document] real fast and [didn't] show it to [Mr. Vitek]"; (2) intentionally misled the witness; (3) did not have exhibits; (4) ignored evidence that exists and told Mr. Vitek to act as if the evidence did not exist; and (5) insinuated that there were no questions attached to Ms. Sill's above-referenced email when they were in Boulder Falcon's document production.[85]

---

[77] ECF No. 77 at 251:17 to 252:7; 254:15 to 255:12; 256:20 to 257:6.

[78] ECF No. 77 at 252:8 to 254:14; 255:13 to 256:19.

[79] ECF No. 77 at 257:7 to 258:16.

[80] ECF No. 77 at 258:17 to 259:7.

[81] ECF No. 77 at 258:21 to 259:2.

[82] ECF No. 77 at 259:7.

[83] ECF No. 77 at 259:8-9.

[84] ECF No. 77 at 259:10-11.

[85] ECF No. 77 at 259:12 to 260:24.

On this latter point (i.e., Ms. Sill's questions being in Boulder Falcon's document production), Mr. Cohan expressed surprise.[86] Mr. Benevento then stated that the attachments to Ms. Sill's emails with her hand-written questions to Ms. Brown were on Bates numbers Boulder 1921-28.[87] Mr. Cohan responds, "Did I ask about those?"[88] Which caused Mr. Benevento to reiterate his allegations of Mr. Cohan misleading the witness for showing Mr. Vitek the emails from Ms. Sill but refusing to point him to the attachments with her hand-written questions.[89] Mr. Cohan reiterated that he had not "gotten to 1900 yet. I'm not there yet. I'm not asking about that. I have not asked about that."[90] Mr. Benevento again asserted that Mr. Cohan asked Mr. Vitek about whether Ms. Sill provided the questions she referenced in her email to Ms. Brown, and Mr. Cohan was insinuating to Mr. Vitek that such questions did not exist when those attachments were clearly in Boulder Falcon's document production.[91]

Mr. Cohan then reiterated why he was proceeding in Bates number order: "That's because of your document dump you've got part of that [i.e., Ms. Sill's email to Ms Brown] in one place and part of that [i.e., the attachments with Ms. Sill's hand-written questions] someplace else. But I haven't asked about that document yet."[92] After additional discussion between counsel about how Boulder Falcon produced documents in load files, Mr. Cohan states, "[T]he Bates-numbered

---

[86] ECF No. 77 at 260:25 to 261:1.

[87] ECF No. 77 at 261:7-10.

[88] ECF No. 77 at 261:11.

[89] ECF No. 77 at 261:12-20.

[90] ECF No. 77 at 262:9-11.

[91] ECF No. 77 at 262:12-20.

[92] ECF No. 77 at 262:16-19.

documents in -- in an order that makes no sense. Why -- why do you have documents that are clearly not produced as they are kept in the normal course of business, nor are they responsive to any particular request?"[93] Mr. Cohan continues, "It's completely inappropriate. Part of what I'm doing is making a record of this bad conduct, because we are going to address it."[94] The deposition then adjourned early.[95]

## II. Mr. Benevento's Path to Action

Just as Mr. Cohan had a path to action to take Mr. Vitek's deposition and to conduct it the way he did, Mr. Benevento had a path to action to end the deposition before the seven-hour time limit. Part of that path encompassed Mr. Cohan's argumentative questions and statements, to be sure, but the record shows that the main reason for terminating Mr. Vitek's deposition early was Mr. Benevento's belief that Mr. Cohan was repeatedly misleading the witness with the intent to unfairly portray him in a bad light. This belief is shown by Mr. Benevento's objections to Mr. Cohan's questions about the credit memos,[96] invoices,[97] and emails that mentioned attachments containing Ms. Sill's questions,[98] among others, some of which have been discussed above.

However, most emblematic of Mr. Benevento's mental story for why Mr. Cohan was doing what he was doing and the emotions it produced in Mr. Benevento is an exchange between Mr. Benevento and Mr. Cohan regarding Bates number Boulder 615, which was an email

---

[93] ECF No. 77 at 266:17-22.

[94] ECF No. 77 at 266:25 to 267:3.

[95] ECF No. 77 at 270:2-9.

[96] ECF No. 77 at 224:18 to 225:19.

[97] ECF No. 77 at 232:6 to 233:4; 259:8-19, 260:4-8.

[98] ECF No. 77 at 260:15 to 263:2.

between Boulder Falcon's employee, Stafford Combs ("Mr. Combs"), and Defendants'

employee, Ms. Brown. The dispute between counsel arose over which invoice Mr. Combs and

Ms. Brown were discussing in an email.[99] Mr. Benevento objected to misleading the witness and

pointed out with some exasperation that the invoice that Mr. Cohan was discussing with Mr.

Vitek was not the same invoice that Mr. Combs and Ms. Brown were discussing in their email

correspondence.[100] The following exchange then occurred:

> **Mr. Cohan**: Bryon, you got to calm down.
>
> **Mr. Benevento**: I'm calm. I'm just tired of you misrepresenting the record. The invoice you showed him about COVID --
>
> **Mr. Cohan**: Why are you so emotional?
>
> **Mr. Benevento**: -- was April 2021. Now you're showing him one of October 2020 and saying isn't this the COVID one.
>
> **Mr. Cohan**: Why are you having a temper tantrum?
>
> **Mr. Benevento**: Because you're misstating the record and you're wasting a lot of people's time. You really are. You're just scrolling through a document production. You have no clue what you are doing. You're just like, here's a document, here's a document, here's a document. What do you say about it? 35 years, I've never seen anyone use documents in a deposition like this where you take a production and just scroll through it.
>
> **Mr. Cohan**: I haven't seen anybody, other than really bad lawyers, produce hundred -- a hundred copies of the same piece of paper and then slip something new inside over and over and over again. There's 7,000 -- almost 7,000 pages in your production, and there's probably not more than a thousand separate documents. It's ridiculous. It's so unprofessional. I'm doing the best I can.
>
> **Mr. Benevento**: File a motion to compel then.

---

[99] ECF No. 77 at 230:1 to 232:8.

[100] ECF No. 77 at 231:20-25.

**Mr. Cohan**: Yours -- yours was a document dump.

**Mr. Benevento**: File a motion to compel then. We'd be happy to argue this in front of Judge Bennett so that you can back up your unfounded allegations. Go ahead.

**Mr. Cohan**: Anything else?

**Mr. Benevento**: No.

**Mr. Cohan**: Can I get back to my deposition?

**Mr. Benevento**: Yeah, assuming you have questions instead of closing statements.[101]

And there it is: Mr. Cohan is trying to make a record of Boulder Falcon's purported document dump, and Mr. Benevento believes that Mr. Cohan is continually misleading Mr. Vitek by ignoring the document production. As to Mr. Benevento specifically, the sinister story he has mentally formulated about Mr. Cohan—which spawned the negative emotions noted above—stemmed from an assumption that Mr. Cohan was using discovery software and, therefore, could easily see which invoices were attached to which emails regardless of the Bates numbers shown on the bottom of each document in Boulder Falcon's production. To Mr. Benevento, because Mr. Cohan could see the attachments to each parent email but kept asking questions of Mr. Vitek asserting that the attachments never existed, Mr. Cohan appeared to be deliberately misleading Mr. Vitek. Combined with Mr. Cohan's argumentative questions and statements during the deposition and the unconventional use of scrolling through Bates numbers instead of providing Mr. Vitek with discrete exhibits that could be viewed and marked for the record, Mr. Benevento

---

[101] ECF No. 77 at 232:1 to 233:18.

concluded that Mr. Cohan was taking the deposition in bad faith to unfairly cast Mr. Vitek in a

bad light, had an emotional reaction based on that belief, and, eventually, ended the deposition

prematurely.[102]

Sadly, it was not until after Mr. Benevento ended the deposition that both sides learned

the truth: Boulder Falcon had produced load files for discovery review software, and Mr. Cohan

had chosen not to use discovery review software and, therefore, had only the raw images of the

documents.[103] Mr. Cohan followed the raw images in Bates number order, which, without the

load files, would produce the nonsensical, duplicative, and unorganized mess that he saw. But, by

then, tempers of both counsel were too high to realize that the source of the conflict was a

misunderstanding of how Boulder Falcon produced its documents, Mr. Cohan's reaction to it,

and Mr. Benevento's reaction to Mr. Cohan's tactics to make a record. Although there is plenty in

this record that should cause both counsel to rethink their behavior, the bottom line is that this

entire saga could have been easily avoided had Mr. Cohan just done what the Federal Rules of

Civil Procedure and their local counterparts require in the face of a discovery problem: meet and

confer before resorting to the "Oh-yeah-I'll-show-you" tactics of litigation.

But because the parties' respective paths to action have led to their respective motions,

this court will now impose the consequences to which each path to action has led. As shown

below, the court first concludes that Mr. Benevento properly terminated Mr. Vitek's deposition

because Mr. Cohan conducted the deposition in bad faith and, therefore, grants Boulder Falcon's

---

[102] The discussion between counsel from ECF No. 77 at 259:8 to 270:9 illustrates this point quite clearly.

[103] ECF No. 77 at 265:11 to 267:3.

motion for protective order. Second, the court imposes sanctions for the bad faith deposition to protect the interests of justice and to maintain civility.

## ANALYSIS

### I.   The Court Grants Boulder Falcon's Motion for Protective Order Terminating Mr. Vitek's Deposition and Denies Defendants' Motion for Sanctions.

Mr. Benevento appropriately terminated Mr. Vitek's deposition because Mr. Cohan took it in bad faith. Fed. R. Civ. P. 30(d)(3)(A) provides: "At any time during a deposition, the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party."[104] Although the term "bad faith" can have many meanings depending upon the context in which it is used, one of its common connotations is to do something for an "improper purpose."[105] Bad

---

[104] Fed. R. Civ. P. 30(d) also requires that the motion for protective order after stopping a deposition be filed rather quickly thereafter. *See, e.g.*, *City of Owensboro v. Ky. Utils., Co.*, No. 04-cv-00087, 2007 WL 1035006, at *1 (W.D. Ky. March 29, 2007) (granting motion for protective order that was filed 17 days after deposition's early termination under Rule 30(d)). But because Boulder Falcon filed its motion for a protective order within two weeks of stopping the deposition, no party appears to contest the timeliness of Boulder Falcon's motion.

[105] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 n.10 (1991) (recognizing that bad faith under Fed. R. Civ. P. 11 and 28 U.S.C. § 1927 means that a filing in litigation "is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or need increase in the cost of litigation" (quotations and citation omitted)); *Two Moms & a Toy, LLC v. Int'l Playthings, LLC*, No. 10-cv-02271, 2011 WL 5593178, at *3 (D. Colo. Nov. 17, 2011) (stating in the context of a motion to amend under Fed. R. Civ. P. 15, "[b]ad faith may also be inferred if a party seeks leave to amend for an improper purpose"); *In re Miller*, 444 B.R. 446, 470 (N.D. Okla. 2011) (stating that "bad faith" under the Bankruptcy Code for filing an involuntary petition includes whether the petition was filed for an "improper purpose" or "improper use" to, among other things, "increas[e] the cost of litigation"); *Reeves v. Dauphin Cnty.*, No. 06-cv-1534, 2008 WL 2054006, at *1 (M.D. Pa. May 13, 2008) (stating that an award of attorney's fees under 28 U.S.C. § 1927 is appropriate if the attorney has multiplied the proceedings in bad faith "in a manner that increases the costs of litigation"); *Lounsbury v. Zion's First Nat'l Bank*, No. 74-cv-191, 1975 WL 640, at *1 (D. Utah June 23, 1975) (stating that the plaintiffs had failed to show that the Internal

faith and improper purpose include unnecessarily increasing the costs of litigation.[106] Further, bad faith can arise when the examining attorney lacks a basis for asking questions that allege adverse facts.[107] As shown in order below, Mr. Cohan conducted the deposition of Mr. Vitek in bad faith by conducting it for an improper purpose and lacking a good faith basis for several questions that asserted adverse facts. Therefore, Mr. Vitek's deposition was justifiably terminated early.

    A.  <u>Mr. Cohan Conducted Mr. Vitek's Deposition for an Improper Purpose</u>.

Making a record of a Boulder Falcon's purported non-compliance with Rule 34 is an improper purpose to take a deposition because the Federal Rules of Civil Procedure and their local counterparts specifically require Mr. Cohan to meet and confer before taking action to address a problem over a Rule 34 production. The title of Fed. R. Civ. P. 37 includes a requirement "to Cooperate in Discovery." One of the discovery cooperation rules that Rule 37 unmistakably requires is for a party to meet and confer before seeking to compel the disclosure

---

Revenue Service issued summonses in bad faith because the plaintiffs could not show an "improper purpose").

[106] *See, e.g.*, *Welk v. GMAC Mortg., LLC*, 720 F.3d 736, 738 (8th Cir. 2013) (affirming district court's imposition of sanctions under Fed. R. Civ. P. 11 and 28 U.S.C. § 1927 for bad faith because plaintiff brought claims to "needlessly increase the cost of litigation" (quotations and citation omitted)).

[107] *See, e.g.*, *United States v. Katsougrakis*, 715 F.2d 769, 779 (2d Cir. 1983) ("Although counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to anticipated questions, he must, when confronted with a demand for an offer of proof, provide some good faith basis for questioning that alleges adverse facts."); *Grady v. Jefferson Cnty. Bd. of Cnty. Comm'rs*, No. 07-cv-01191-WDM-KMT, 2008 WL 619219, at *4 (D. Colo. March 3, 2008) (granting motion to enforce protective order because, among other reasons, questioning attorney unlikely to have a good faith basis to ask certain personal questions in a deposition about conduct that was long before the case).

of discovery.[108] Additionally, DUCivR 37-1(a) requires that "parties must make reasonable efforts to resolve a discovery dispute," which "[a]t a minimum," includes "a prompt written communication sent to the opposing party . . . requesting to meet and confer, either in person or by telephone, and including suggested dates and times."[109] If meeting and conferring does not resolve the matter, then DUCivR 37-1(b)(2)(C) requires the aggrieved party to file its motion "no later than 45 days after the prompt written communication in section 37-1(a)(2) was sent to opposing counsel."

The requirement to meet and confer is neither optional nor a meaningless formality.[110] To the contrary, it is a check against an erroneous path to action by causing parties to take a hard look at their viewpoints and "to engage in a meaningful dialogue about their respective positions on disputed issues"[111] so that they can "resolve issues without the need for further action."[112] Indeed, meeting and conferring first to avoid litigation later saves the parties, their counsel, the court, and the taxpayers the hassle and expense of further litigation.[113]

There is no evidence that Mr. Cohan attempted to meet and confer here. Indeed, there is no evidence that he attempted follow DUCivR 37-1 by: (1) promptly submitting a letter to

---

[108] Fed. R. Civ. P. 37(a)(1).

[109] DUCivR 37-1(a)(1), (a)(2)(B).

[110] *Dairy v. Harry Shelton Livestock, LLC*, No. 18-cv-06357-RMI, 2020 WL 6269541, at *1 (N.D. Cal. Oct. 23, 2020).

[111] *Id.*

[112] *California v. Iipay Nation of Santa Ysabel*, No. 14-cv-2724, 2015 WL 2449527, at *6 (S.D. Cal. May 22, 2015).

[113] *See, e.g.*, *Wong v. Astrue*, No. 08-cv-02423, 2008 WL 4167507, at *2 (N.D. Cal. Sept. 8, 2008).

Boulder Falcon's counsel detailing his issues with its document production; and (2) suggesting times to meet and confer about those issues. Moreover, the conversation the parties' counsel had at the end of Mr. Vitek's deposition clearly indicates that no meet and confer ever occurred because it appears that was the first time they discussed even the basic format of Boulder Falcon's document production. Nevertheless, even assuming *arguendo* that Mr. Cohan attempted to meet and confer and that Boulder Falcon rebuffed Mr. Cohan's request, Mr. Cohan had an obligation to file a motion to compel with this court no later than 45 days after his letter detailing his problems with Boulder Falcon's document production.[114] That clearly did not happen, and Mr. Cohan did not file a motion seeking to extend his deadline to file a motion to compel.[115] Thus, by failing to file a motion to compel within the specified time, Mr. Cohan would have waived his objections to Boulder Falcon's production,[116] which further demonstrates the futility of "making a record" of Boulder Falcon's alleged document dump by taking Mr. Vitek's deposition.

If a case exists showing why the federal and local rules require counsel to promptly meet and confer, it is the situation posed here. Mr. Cohan believed himself to be the victim of a disheveled, disorganized, and duplicative "document dump" at the hands of Boulder Falcon. Had he attempted to meet and confer with Boulder Falcon's counsel about the format of the document production, however, Mr. Cohan would have quickly learned that Boulder Falcon's document production was in the form of load files. At this point, Mr. Cohan would have had a choice:

---

[114] DUCivR 37-1(b)(2)(C).

[115] *Id.*

[116] *Id.*

(1) use discovery review software to review the production; or (2) request that Boulder Falcon produce the discovery anew in a logical format that Mr. Cohan could follow without the need to employ discovery software. Had Mr. Cohan chosen the latter, and had Boulder Falcon's counsel refused, then Mr. Cohan could have filed a motion to compel under Rule 37(a). In other words, Mr. Cohan's problems with Boulder Falcon's document production could have been resolved with or without court intervention but certainly without the need to take Mr. Vitek's deposition for the purpose of making a record of the obvious.

This is not judicial speculation. The record in this case highlights that even the deformed, anger-ridden "meet and confer" that the parties attempted to have at the end of Mr. Vitek's deposition revealed useful information that, under less heated circumstances, would have produced the result that a meet and confer is intended to have. After Mr. Benevento ended the deposition and the parties discussed where Ms. Sill's email attachments were in the document production relative to her email mentioning those attachments, Boulder Falcon revealed that it had produced load files. Adam C. Buck, who is also counsel for Boulder Falcon, said that once those load files are put "into a document management program, you would have been able to see email with attachment[s] side-by-side. That's exactly how it's done. And for you to suggest that this was some sort of document dump is simply not accurate."[117] This discussion could and should have been had long before the deposition. And under less hostile conditions, the court can easily infer that the parties would have discussed a solution to the problem, which was not born of Boulder Falcon's foul play—because load files are standard for electronically stored

---

[117] ECF No. 77 at 265:11-17.

information these days[118]—but of a misunderstanding as to what Boulder Falcon had produced and what Mr. Cohan's resources were.

Had this meet and confer occurred, Boulder Falcon could not reasonably dispute that load files are a mess without the benefit of discovery review software. And had Boulder Falcon needed any persuading on that point, Mr. Cohan showing Boulder Falcon's counsel what he showed Mr. Vitek would have done the trick. Indeed, Mr. Vitek's deposition did not provide *any* new information that a cursory review of the load file production itself would not have revealed. Instead, Mr. Vitek's deposition required the parties to incur substantial costs for the attorney time preparing the witness, Mr. Vitek's time, attorney time to prepare to depose Mr. Vitek, a court reporter, attorney time during the deposition, and now, two motions and their attendant memoranda plus oral argument on the motions. Moreover, counsel's conduct at the terminated deposition has now taxed opposing counsel's working relationship to the point that it appears to be in or on the verge of metaphorical bankruptcy.

Yet, these significant costs to the parties fail to consider the impact on the court. Assuming, *arguendo*, that the parties could not have worked out a solution for Mr. Cohan's review of Boulder Falcon's document production, the court would have promptly decided a simple short-form motion regarding the form of production. Whereas now, that relatively simple form-of-production motion has snowballed into two rather complicated motions regarding the

---

[118] *See, e.g.*, *Equal Emp. Opportunity Comm'n v. SVT, LLC*, No. 13-cv-245, 2014 WL 1411775, at *3 (stating "[w]ithout load files, there is no way 'to ensure transfer of accurate and usable images and data'" and, coincidentally, ordering the parties to meet and confer to work out a manner to deal with load files (quoting The Sedona Conference, *The Sedona Conference Glossary, E-Discovery & Digital Information Mgmt.*, 50 (Sherry B. Harris et al. eds., 3d ed. 2010))).

early termination of a deposition that require far more court resources: watching the nearly

five-hour video deposition, reading the transcript, re-reading the transcript, reading the transcript

a few more times, researching, and writing this lengthy decision. Although the court usually

enjoys heavy judicial lifting, the court does not when it never would have needed to exert the

effort had Mr. Cohan simply followed the law and reasonably attempted to meet and confer

about Boulder Falcon's production instead of taking Mr. Vitek's deposition to make a record of

the obvious. Mr. Cohan's course of action to bypass the rules is the epitome of taking an action

that unnecessarily increases the costs of litigation. Accordingly, the deposition was appropriately

terminated for having been taken in bad faith.

　　　　To the extent Defendants contend that Mr. Cohan took Mr. Vitek's deposition for reasons

other than making a record of Boulder Falcon's purported document dump, such a contention is

unpersuasive. The record clearly establishes that Mr. Cohan's examination of Mr. Vitek

proceeded in mostly Bates-number order of Boulder Falcon's production. Mr. Cohan emphasized

this fact with both Mr. Vitek and Mr. Benevento.[119] In this course of order, Mr. Cohan asked Mr.

Vitek about approximately 47 invoices about which Mr. Vitek repeatedly said he had no

information because Boulder Falcon accounting staff handled any invoice disputes.[120] Yet, Mr.

Cohan kept asking Mr. Vitek about any disputes and failures to pay regarding these invoices in

mostly numerical order despite getting what amounted to the same answer nearly every time.

Even when Mr. Cohan queried Mr. Vitek about email correspondence instead of invoices, many

---

[119] ECF No. 76 at 3 (stating that Defendants "were discussing documents in sequential Bates Number order" during Mr. Vitek's deposition); ECF No. 77 at 232:11 to 233:8.

[120] *See, e.g.*, ECF No. 77 at 168:7-18; 204:12-19.

of the questions about emails dealt with whether the attachments that Boulder Falcon employees purported to send were actually sent because they did not follow the parent email. Mr. Cohan was clearly questioning Mr. Vitek about the order of the document production instead of the contents of disputed invoices. Although "[o]ne of the main purposes of the discovery rules, and the deposition rules in particular, is to elicit the facts before the trial and to memorialize witness testimony before the recollection of events fade,"[121] this was clearly not the reason why Mr. Cohan took Mr. Vitek's deposition. Indeed, the main purpose for taking Mr. Vitek's deposition was—as Mr. Cohan stated during the deposition and during oral argument—to make a record of Boulder Falcon's purported violation of Rule 34. However, Mr. Cohan's legal duty was to meet and confer—not to seek a deposition about the things that a meet and confer may have solved and, if not, what a motion to the court certainly would have. Thus, even if Mr. Cohan had other reasons to take Mr. Vitek's deposition besides making a record of Boulder Falcon's purported Rule 34 violation, those other reasons are inadequate to undermine the court's determination of bad faith.

B. Mr. Cohan's Questions to Mr. Vitek that Lacked Any Good Faith Basis Independently Manifest Bad Faith.

Independent of the improper purpose for taking Mr. Vitek's deposition, this court finds bad faith because of the questions that Mr. Cohan asked Mr. Vitek that asserted adverse facts without a good faith basis. Asserting adverse facts in a deposition question without a basis for

---

[121] *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 277 F.R.D. 286, 297 (E.D. Va. 2011).

doing so is a reason to issue a protective order and to impose sanctions.[122] After all, Fed. R. Civ.

P. 30(d)(2) recognizes the need for sanctions when "a person . . . frustrates the fair examination

of the deponent." The bad faith questions in Mr. Vitek's deposition fall into two categories:

(1) the questions asserting or strongly insinuating, "Why didn't you pay?" on 7 invoices when

Defendants' records show otherwise; and (2) questions asking, "Do you dispute anything?" on 3

invoices when Defendants' records show that they had been fully paid before litigation. Each

category is discussed below.

1. The "Why didn't you pay" Questions

The record shows that Mr. Cohan asked Mr. Vitek about 7 different invoices where Mr.

Cohan directly asserted or strongly insinuated that Boulder Falcon had not paid even though

Defendants' own accounting records showed that Boulder Falcon had paid over a year *before* Mr.

Vitek's deposition in this action.[123] Asserting these facts when Defendant's own records show no

---

[122] *United States ex rel. Baltazar v. Warden*, 302 F.R.D. 256, 260-61 (N.D. Ill. 2014) (granting a protective order and imposing sanctions against deposing counsel because, among other reasons, counsel asserted facts in questions without a factual basis for doing so).

[123] *Compare* ECF No. 77 at 155:12 to 156:7 (asking thrice why Boulder Falcon didn't pay invoice 4682 in the amount of $41,338.40); *with* ECF No. 71-5 at 2 of 2 (showing that the *actual* amount for invoice 4682 was $41,335.40 and was paid on June 4, 2021); ECF No. 77 at 157:2 to 158:15 (asking twice why Boulder Falcon did not pay invoice 4925 in the amount of $38,911.57), *with* ECF No. 71-5 at 2 of 2 (showing that the *actual* amount for invoice 4925 charged $38,908.57 and was paid on July 14, 2021); ECF No. 77 at 158:16 to 161:7 (asking three times why Boulder Falcon did not pay invoice 5089 in the amount of $15,486.25), *with* ECF No. 71-5 at 2 of 2 (showing that the *actual* amount of invoice 5089 was $15,483.25 was paid on October 13, 2021); ECF No. 77 at 203:16 to 204:19 (asking, "Did you pay for it?" and, "Do you owe them money?" twice for invoice 5218 in the amount of $5,407.25), *with* ECF No. 71-5 at 2 of 2 (showing that the *actual* amount for invoice 5218 was $5,404.75 and was paid on October 13, 2021); ECF No. 77 at 235:3 to 235:17 (asking "Do you know of any reason why you shouldn't pay for [invoice 5051 in the amount of $16,289.06]?"), *with* ECF No. 71-5 at 2 of 2 (showing that the *actual* amount for invoice 5051 was $16,286.06 and was paid on September 2, 2021; ECF No. 77 at 235:18 to 236:1 (asking, "Do you know any reason why you shouldn't pay

basis to do so is the epitome of bad faith. And Mr. Cohan cannot use Boulder Falcon's document production to excuse his actions because Defendants clearly kept records of what Boulder Falcon owed and what it had paid. If one of Mr. Cohan's secondary purposes for taking Mr. Vitek's deposition was to find out why Boulder Falcon was not paying invoices, then he easily could have focused on the specific invoices that Boulder Falcon had not paid.[124] But showing Mr. Vitek invoices that had been long paid and asking why he had not paid them is an improper deposition method that thwarts a fair examination of the deponent.

When the court asked Mr. Cohan at oral argument why he asked these questions, Mr. Cohan contended that he had not asked "why didn't you pay" questions, but also said that, if he did, it was an accident that may have been done very few times because what he was really trying to ask was whether Mr. Vitek disputed anything on the invoice. The record clearly reflects otherwise. In fact, he asked the "why didn't you pay" question multiple times regarding the same paid invoice. This is not an accidental oversight; it is bad faith.

2. The "Do you dispute anything on this invoice" questions

Moreover, even the "do you dispute anything on this invoice" questions are tainted with bad faith on at least 3 invoices. The record shows that Mr. Cohan occasionally mixed his "why

---

[for invoice 4508 in the amount of $5,514.31]?"), *with* ECF No. 71-5 at 2 of 2 (showing that invoice 4508 was *actually* for $5,511.31 and was paid on June 11, 2021); ECF No. 77 at 254:15 to 255:8 (asking, "Do you see anything that looks out of line there?" and, "Do you know of any reason why you shouldn't have to pay [invoice 4459 in the amount of $15,259.35]?"), *with* ECF No. 71-5 at 2 of 2 (showing that the *actual* amount for invoice 4459 was $15,256.35 and was paid on June 11, 2021).

[124] The court is setting aside the fact that Mr. Vitek was deposed under Rule 30(b)(1) instead of Rule 30(b)(6) and, therefore, was testifying on his own behalf instead of on behalf of Boulder Falcon.

didn't you pay" questions with "do you dispute anything on this invoice" on the same invoice.[125]

By mixing these questions together and then repeatedly asking the "do you dispute anything in this invoice" queries on other invoices, Mr. Cohan was clearly insinuating "why didn't you pay?" on all the invoices. The obvious reason to ask "do you dispute anything on this invoice" is to figure out why the invoice was not paid because, if the invoice were paid before this litigation started, then it is clearly not in dispute in this litigation.[126] Over the course of approximately 47 invoices, Mr. Cohan's message of "you did not pay" becomes clear especially when adding Mr. Cohan's argumentative statements and questions to the mix that asserted that Boulder Falcon did not pay and was a perennial deadbeat at bill paying.[127]

The problem is, however, that at least 3 of the invoices falling exclusively within the 33 invoices subject to the "do you dispute anything" line of questioning were paid according to

---

[125] ECF No. 77 at 155:24 to 156:7 (discussing Bates number Boulder 37); 157:2 to 158:15 (discussing Bates number Boulder 39); 158:16 to 161:8 (discussing Bates number Boulder 41); 162:10 to 163:17 (discussing Bates number Boulder 43); 164:21 to 165:15 (discussing Bates number Boulder 47); 170:17 to 172:6 (discussing Bates number Boulder 64); 194:15 to 195:22 (discussing Bates number Boulder 106); 235:18 to 236:1 (discussing Bates number Boulder 670, 673); 254:19 to 255:12 (discussing Bates number Boulder 765).

[126] This point lends further support to Mr. Cohan's improper purpose for taking Mr. Vitek's deposition because Mr. Vitek provided little, if any, information on any of the invoices. First, Mr. Vitek was a witness under Fed. R. Civ. P. 30(b)(1) and, therefore, was not speaking on behalf of Boulder Falcon. Second, repeatedly asking Mr. Vitek about whether dozens of invoices— whether paid or unpaid—served no purpose because Mr. Vitek continually stated that he had no idea what, if anything, was disputed or disputable on these invoices because his accounting staff handled the disputes. ECF No. 77 at 168:7-18; 204:12-19. Nothing was revealed about why Boulder Falcon failed to pay an invoice. The only thing that Mr. Cohan was able to show is what was already common knowledge: the load file production was not in a logical order when reviewed without discovery review software.

[127] See, e.g., ECF No. 77 at 82:17-23 (Mr. Cohan: "Do you know you owed almost $400,000 at that point?" Mr. Vitek: "That's what you allege." Mr. Cohan: "And that's what the *unpaid* bills reflect?" (emphasis added)); 242:10-12 (Mr. Cohan: "Do you see that there's sort of constantly my client was chasing after your guys for money?").

Defendants' own records *before* the deposition was taken.[128] But Mr. Cohan asked the "do you

dispute anything on this invoice" question anyway, which, given the way Mr. Cohan was mixing

these types of questions, amounts to "why didn't you pay?". The court fails to see a good faith

basis to ask whether Mr. Vitek "disputed" anything on these three paid invoices.[129] Accordingly,

Mr. Cohan asserted facts adverse facts in his questions about 10 invoices for which Defendants'

own records showed no good faith basis, which misled the witness. Hence, the court finds that

the deposition was taken in bad faith and warrants a protective order for the deposition's early

termination. This necessarily means that Defendants' motion for sanctions against Boulder

Falcon for terminating the deposition early is denied.

## II.   The Court Imposes Sanctions Because Mr. Cohan's Conduct Frustrated the Fair Examination of Mr. Vitek.

Mr. Cohan's conduct frustrated the fair examination of Mr. Vitek and warrants sanctions.

Fed. R. Civ. P. 30(d)(2) provides that the court "may impose an appropriate sanction--including

the reasonable expenses and attorney's fees incurred by any party--on a person who impedes,

delays, or frustrates the fair examination of the deponent." The court first addresses why Mr.

---

[128] *Compare* ECF No. 77 at 197:6-21 (asking, "[D]o you dispute any part [of invoice 4731 dated May 16, 2021 in the amount of $8,180.48]?"), *with* ECF No. 71-5 at 2 of 2 (showing that invoice 4731 dated May 16, 2021, was *actually* for $8,177.48 and that $8,177.48 was paid on June 11, 2021); ECF No. 77 at 212:1-14 (asking, "Do you dispute any part of [invoice 4526 dated April 1, 2021 in the amount of $82,969]?"), *with* ECF No. 71-5 at 2 of 2 (showing that invoice 4526 dated April 1, 2021, was *actually* for $82,807.90 and that $82,807.90 was paid on April 9, 2021); ECF No. 77 at 236:16 to 237:7 (asking, "Do you see anything that looks out of line on [invoice 4762 dated May 31, 2021, in the amount of $10,589.79]?), *with* ECF No. 71-5 at 2 of 2 (showing that invoice 4762 dated May 30, 2021, was *actually* for $10,586.79 and that $10,586.79 was paid on July 3, 2021).

[129] Given that the court has limited accounting records, the court assumes that Mr. Cohan's "do you dispute anything" questions about the other 30 invoices in this category had a good faith basis.

Cohan's conduct frustrated the fair examination of Mr. Vitek and then imposes sanctions to protect the interests of justice and continued civility.

    A.  <u>Mr. Cohan's Conduct Frustrated a Fair Examination of Mr. Vitek</u>.

    Mr. Cohan's conduct frustrated the fair examination of Mr. Vitek. Courts interpret the Federal Rules of Civil Procedure according to their plain meaning.[130] To determine the plain meaning of a rule, courts may consult a dictionary.[131] The Oxford Dictionary defines the term "fair" as, among other definitions, "free from bias, fraud, injustice; equitable; legitimate, valid, sound" and "[a]llowed by the rules; made or done according to the rules; permissible, legitimate."[132] As discussed summarily below, Mr. Vitek's deposition was taken neither in accordance with the Federal Rules of Civil Procedure nor free from injustice.

    First, instead of taking Mr. Vitek's deposition to "to elicit the facts before the trial and to memorialize witness testimony before the recollection of events fade,"[133] Mr. Cohan took the deposition to avoid his obligation under the Federal Rules of Civil Procedure and their local counterparts to meet and confer with opposing counsel about a document production. As shown amply above, Mr. Cohan did not examine Mr. Vitek to find out information about the issues in the case but to unnecessarily make a record of Boulder Falcon's purported document dump.

---

[130] *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 540 (1991) ("We give the Federal Rules of Civil Procedure their plain meaning." (quotations and citation omitted)).

[131] *Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1381 (10th Cir. 2009) ("We may consult a dictionary to determine the plain meaning of a term.").

[132] *Fair*, oed.com, https://www.oed.com/view/Entry/67704?rskey=tftK7O&result=2&isAdvanced=false#eid (last visited March 7, 2023).

[133] *E.I. du Pont de Nemours & Co.*, 277 F.R.D. at 297.

Consequently, the questions that Mr. Cohan asked Mr. Vitek were rarely answered with anything that could be deemed useful to the claims and defenses pending in the lawsuit and were merely asked to highlight what anyone familiar with load files knows: without discovery review software, they are extremely difficult to decipher. Under these circumstances, the purpose and structure of Mr. Vitek's deposition was hardly proper given what the Federal Rules of Civil Procedure and their local counterparts unmistakably require.

Second, asking Mr. Vitek questions asserting adverse facts that Mr. Cohan knew or clearly should have known were false is hardly fair under any sense of that word. This is especially true where, as here, knowing the falsity of the adverse facts asserted in his questions to Mr. Vitek was patently manifest in his own client's records. Mr. Cohan cannot blame Boulder Falcon's document production for failing to know the facts that were in Defendants' possession long before this lawsuit was filed or Mr. Vitek's deposition was noticed. Thus, Mr. Vitek questions that asserted adverse facts that were clearly false interfered with a "fair" examination of Mr. Vitek.

B.  The Court Imposes Appropriate Sanctions to Protect Justice and Maintain Civility.

Although the court does not have to impose sanctions here,[134] it will do so to protect justice and to maintain civility. Where, as here, the parties find themselves at the rocky bottom of the incivility spiral, the court should use its authority "to maintain standards of civility and professionalism. It is precisely when animosity runs high that playing by the rules is vital . . . .

---

[134] *Nebeker v. Nat'l Auto Plaza*, 643 F. App'x 817, 826 (10th Cir. 2016) ("The district court has discretion to impose appropriate sanctions when a person impedes, delays, or frustrates the fair examination of the deponent, but the district court in no way is obligated to do so." (quotations and citation omitted)).

Because depositions take place in law offices rather courtrooms, adherence to professional standards is vital, for the judge has no direct means of control."[135] The court first imposes sanctions to protect justice and then imposes sanctions to maintain civility.

To protect justice, the court strikes Mr. Vitek's deposition transcript and precludes it from being used for any purpose in this action. Although the court found that Mr. Vitek's deposition was appropriately terminated due to Mr. Cohan's conduct, the court finds that Defendants' case warrants at least some opportunity to depose Mr. Vitek despite Mr. Cohan's actions. Consequently, the court will allow Mr. Vitek to be deposed for the two hours remaining in the 7-hour period allowed under Rule 30(d)(1).

To maintain standards of civility, the court orders that Mr. Vitek's two-hour deposition be taken before the court, in person, at the Orrin G. Hatch United States Courthouse in courtroom 7.100 at a date and time that is mutually convenient to the parties and their respective counsel. Counsel shall file a joint status report no later than March 22, 2023, providing at least 6 dates when they would be mutually available to finish Mr. Vitek's deposition. The court will preside over the deposition, will respond to objections as they are made, and will swiftly impose sanctions (including contempt of court) for any unprofessional or uncivil conduct. Because a deposition should occur as an examination would at trial,[136] the court will also preclude the deposing attorney from making a scrolling document presentation to Mr. Vitek from Boulder

---

[135] *Redwood v. Dobson*, 476 F.3d 462, 469-70 (7th Cir. 2007).

[136] Fed. R. Civ. P. 30(c) ("The examination and cross-examination of a deponent proceed as they would at trial under the Federal Rules of Evidence . . . ."); *id.* advisory committee's note to 1993 amendment ("In general, counsel should not engage in any conduct during a deposition that would not be allowed in the presence of a judicial officer.").

Falcon's document production. Instead, the deposing attorney will: (1) have discrete exhibits prepared and pre-marked; (2) provide copies of such exhibits to opposing counsel, to the court, and to the witness before asking questions about the exhibits; and (3) lay appropriate foundation for each exhibit with the witness. Prior to the two-hour deposition, the court orders both Mr. Cohan and Mr. Benevento to read and file a certification that they have read and agree to abide by the Utah Standards of Professionalism and Civility. Failure to do so will preclude counsel from attending and participating in the deposition.

Although the court has discretion to award attorney's fees in addition to the sanctions listed above, the court declines to do so because the level of incivility between both parties' counsel at the deposition rises to the level of circumstances that make an award of fees unjust.[137] However, make no mistake, if what happened at Mr. Vitek's November 17, 2022 deposition happens before me in the upcoming two-hour deposition, paying attorney fees may be the lesser of the offending counsel's worries.

## ORDER

For the reasons stated above, the court HEREBY ORDERS:

- Defendants' motion for sanctions[138] is DENIED.

- Boulder Falcon's motion for protective order[139] is GRANTED with sanctions imposed as set forth above.

---

[137] Fed. R. Civ. P. 26(c)(3) (stating that Fed. R. Civ. P. 37(a)(5) governs imposition of awarding expenses, including attorney's fees, when granting a protective order); Fed. R. Civ. P. 37(a)(5)(A)(iii), (a)(5)(B) (stating that a court "must" award expenses and fees unless, among other things, "other circumstances make an award of expenses unjust").

[138] ECF No. 66.

[139] ECF No. 70.

42

IT IS SO ORDERED.

DATED this 8th day of March 2023.

BY THE COURT:

JARED C. BENNETT
United States Magistrate Judge