IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BOULDER FALCON, LLC, a Utah limited liability company,<br><br>    Plaintiff,<br><br>v.<br><br>ROBERT BROWN, an individual, and IFLYAJET, INC., a Georgia corporation,<br><br>    Defendants. | **MEMORANDUM DECISION & ORDER ON THE PARTIES' CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT**<br><br>**FILED UNDER SEAL**<br><br>Case No. 2:22-cv-00042<br><br>District Judge Jill N. Parrish |
| BOULDER FALCON, LLC, a Utah limited liability company, BOULDER VENTURES DEVELOPMENT, INC., a Utah corporation, and JEFFREY M. VITEK, an individual,<br><br>    Counterclaim Defendants. | |

Boulder Falcon, LLC ("Boulder Falcon") sued Robert Brown ("Mr. Brown") and IFLYAJET, Inc. ("IFJ"), asserting contract and tort claims related to a purported agreement ostensibly for the shared ownership of a Dassault Falcon 50 Aircraft ("Aircraft"). Mr. Brown and IFJ counterclaimed, asserting contract and tort claims related to the same agreement against Boulder Falcon, Boulder Ventures Development, Inc. ("Boulder Ventures"), and Jeffrey M. Vitek ("Mr. Vitek").

Before the court are the parties' cross-motions for partial summary judgment. For the reasons set out below, Defendants Robert Brown's and IFLYAJET, Inc.'s Motion for Partial

Summary Judgment, ECF No. 151 (filed under seal) ("Defs.' Mot.") is **GRANTED IN PART AND DENIED IN PART**, and Plaintiff and Counterclaim Defendants' Motion for Partial Summary Judgment, ECF No. 142 (filed under seal) ("Pl.'s Mot."), is **DENIED**.

**FACTUAL BACKGROUND**

This case involves a purported contract—the Shared Ownership Agreement, ECF Nos. 100-1, 100-2 ("Agreement")—to share ownership and use of a Dassault Falcon 50 Aircraft, ECF No. 100 ¶ 10 ("SAC"), between Boulder Falcon, IFJ, and third-party Geyer Aviation ("Geyer"). *Id.* ¶ 14. The parties agree that, in early 2021, they were in negotiations regarding the Aircraft. The Agreement, purporting to, *inter alia*, divvy out the use and ownership of the Aircraft, create a duty to register the Aircraft, and allocate responsibility for servicing existing loan liabilities in proportion to the parties' agreed-upon ownership interests, was drafted and circulated among the parties as part of these negotiations. The signature page of the document stated, above the caption blocks, "DULY EXECUTED and delivered by the undersigned Members, effective as of March __, 2021." *See* Agreement at 14.

Mr. Brown and IFJ assert that Boulder Falcon never executed or delivered the Agreement. Defs.' Mot. at 14. They argue that there was never a meeting of the minds, and that the Agreement remains an ineffectual artifact of negotiations with no legal significance. Defs.' Opp'n Mem. at 11. Boulder Falcon, on the other hand, maintains that it signed and delivered the Agreement. It argues that an executed version of the Agreement was, in fact, sent to an agent of IFJ in Arizona. Pl.'s Opp'n Mem. at 23.

Boulder Falcon also argues that, independent of the fact of signature and delivery, it manifested assent to be bound by the terms of the Agreement by paying IFJ for the use of the Aircraft in accordance with its terms. Pl.'s Mot. at 17-22. For example, Boulder Falcon points to

2

its April 9, 2021 payment of a "One Month Reserve Fixed Expenses Deposit" and other sums per IFJ's invoice as demanded by the Agreement and in proportion to its ownership interest identified therein (74.5%). *see* ECF No. 142-4 (filed under seal); Pl.'s Mot. at 5, 9; Pl.'s Mot. at 8-9; ECF No. 177-2. Boulder Falcon argues that it would have had no reason to make such payments but for an intent to be bound by the Agreement (or an understanding that it was, in fact, already bound).

Mr. Brown and IFJ, in turn, argue that Boulder Falcon's conduct could not have given legal effect to the Agreement as a matter of law. They also argue that Boulder Falcon's conduct did not conform perfectly to the demands of the Agreement (for example, the amounts paid by Boulder Falcon varied from the contractual terms by about thirty dollars), making such conduct insufficient to signal acceptance of its terms. Defs.' Opp'n Mem. at 16.

Defendants also argue that the payment of the One Month Reserve Fixed Expenses Deposit occurred prior to the final version of the Agreement being circulated, and they point to email correspondence of Mr. Vitek as demonstrating the lack of an intent to be bound. On April 10 or 11, Mr. Brown emailed Mr. Vitek to indicate that Geyer wanted a new contractual term regarding its right of first refusal. Defs.' Mot. at 11, ¶ 67. IFJ then circulated the final revision bearing the signatures of Mr. Brown and Geyer. Defs.' Opp'n Mem. at 8-9; Agreement at 14. When the Agreement was again presented to Mr. Vitek for signature, Mr. Vitek declined to sign and asked Mr. Brown "[w]hat is this? Why now are we doing this?" ECF No. 163-2 at 6; Defs.' Opp'n Mem. at 9.

Because Mr. Vitek (as agent of Boulder Falcon) was presented with the final Agreement and allegedly did not sign it, Mr. Brown and IFJ argue that he demonstrated a lack of any intent to

be bound by it.[1] Likewise, because Boulder Falcon's payment of invoices according to the Agreement's terms began just before the April 10-11 revisions to the Agreement, Mr. Brown and IFJ argue that Boulder Falcon's conduct cannot create an inference of any intent to be bound by the final Agreement, even if such payments continued for several months afterwards. Defs.' Opp'n Mem. at 3 n.1, 13-14. In any case, by the end of 2021, the parties' relationship had broken down, with Geyer purportedly having withdrawn from the arrangement (whether or not such arrangement was sealed by contract). Defs.' Mot. at 11; Pl.'s Reply Mem. at 10. Boulder Falcon commenced this action in early 2022.

Boulder Falcon alleges that the Agreement was breached by Mr. Brown and IFJ in a number of ways, culminating in the eventual transfer of the Aircraft in an allegedly "orchestrated" default and sale in order to benefit Mr. Brown and his associates to the detriment of Boulder Falcon. SAC ¶ 46, 58, 69, 102(e)-(f), 128, 144. Part of the dispute arose from the movement of the Aircraft from Utah to Georgia by IFJ. While IFJ claims that the movement was for temporary maintenance, and that it informed Boulder Falcon of such, Boulder Falcon argues that the transfer was self-dealing, violative of the Agreement, and tortious conversion. Defs.' Mot. at 16; Defs.' Reply Mem. at 16; Pl.'s Mot. at 3.

Under the operative complaint, Boulder Falcon styles seven causes of action against Mr. Brown and IFJ. These claims are: (1) Breach of the Shared Ownership Agreement, (2) Specific Performance of the Shared Ownership Agreement, (3) Accounting, (4) Conversion, (5) Declaratory Judgment, (6) Unjust Enrichment, and (7) Alter Ego/Veil Piercing. *See* SAC at 19-33. Many of

---

[1] Boulder Falcon, however, would draw an altogether different inference from the email exchange: namely, that Mr. Vitek understood Boulder Falcon as already having accepted the terms of the Agreement through signature or conduct.

these asserted claims are not substantive, stand-alone causes of action, but are instead remedial theories. Nonetheless, for the sake of clarity, the court refers to Boulder Falcon's claims and remedial theories using the claim numbers laid out in the SAC.

In their answer, Mr. Brown and IFJ assert six counterclaims against Boulder Falcon, Boulder Ventures, and Mr. Vitek. See ECF No. 106. Like Boulder Falcon, Mr. Brown and IFJ style as claims or causes of action doctrines or theories that are neither claims nor causes of action. Nonetheless, the counterclaims are as follows: (1) Breach of Contract, (2) Open Account, (3) Promissory Estoppel, (4) Quantum Meruit, (5) Unjust Enrichment, and (6) Alter Ego/Piercing the Corporate Veil. *Id*. at 17-19. Mr. Brown and IFJ moved for and were denied dismissal of Boulder Falcon's complaint, *see* ECF No. 52 ("Rule 12 Order"), and the parties subsequently filled cross-motions for partial summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "A fact is material only if it might affect the outcome of the suit under the governing law. And a dispute over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016).

Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court

must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

However, this does not mean that nonmovants may "defeat summary judgment by relying on ignorance of the facts, on speculation, or on suspicion." *Genzer v. James River Ins. Co.*, 934 F.3d 1156, 1160 (10th Cir. 2019) (citation omitted). "Rather, to defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) (cleaned up).

In any case, a plaintiff "must still identify sufficient evidence requiring submission to the jury," *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1142 (10th Cir. 2009); *accord Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005), where such evidence offered is in admissible form. *Wetherill v. Bank IV Kan., N.A.*, 145 F.3d 1187, 1191 (10th Cir. 1998). Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## DISCUSSION

### I.   Defendants Mr. Brown's and IFJ's Motion

Mr. Brown and IFJ seek summary judgment as to all of Boulder Falcon's claims, as well as to their own second and fifth counterclaims (those pleaded under open account and unjust enrichment) against Boulder Falcon, Boulder Ventures, and Mr. Vitek. *See* Defs.' Mot. at 1. In considering whether Mr. Brown and IFJ have demonstrated an entitlement to summary judgment, the court begins by considering Boulder Falcon's breach-of-contract claim, focusing primarily on

6

the issue of contract formation, before turning to Boulder Falcon's remaining claims and Mr. Brown's and IFJ's counterclaims.

### A. Contract Claims

Mr. Brown and IFJ move for summary judgment on the ground that the Agreement "is not a valid contract under Georgia law because Boulder did not deliver an executed copy of the Agreement to IFJ until Geyer Aviation had withdrawn." Defs.' Mot. at 25.[2] They maintain that Boulder Falcon's claims arising under contract fail because "[n]o reasonable jury could find that Boulder delivered an executed copy of the contract" as demanded by Georgia law. *Id*. at 27.

For the reasons outlined below, it is not immediately clear that the law of Georgia ought to govern contract formation questions. But even if Georgia law properly applies to the formation question, Mr. Brown and IFJ misstate the legal standard for contract formation and what a jury must find. In the following sections, the court outlines the applicable law and considers whether a genuine dispute exists as to the material facts regarding the question of contract formation. The court then considers whether the Agreement, assuming it represents a properly formed contract, precluded damages claims, as well as whether a genuine dispute exists as to Boulder Falcon's breach theories. Because both sides have filed cross-motions for summary judgment regarding the

---

[2] Mr. Brown's and IFJ's first ground on which they seek summary judgment as to the contract claims is premised on their contention that Boulder Falcon did not own the Aircraft. *See* Defs.' Mot. at 22-25. While the parties volley this argument through their memoranda on Defendants' motion, they do so without much purpose. The materiality of such "ownership" is discussed below in relation to Boulder Falcon's breach theories regarding ownership under its contract claim, as well as in the court's discussion of Boulder Falcon's conversion claim. However, the parties seem to misunderstand the significance of "ownership" in determining whether summary judgment is appropriate as to either cause of action.

existence of a valid contract, the court blends argument from both motions regarding formation questions in this section.

           i)        Choice of law as to formation

This court has already addressed much of the choice-of-law complexity presented by this case. *See* Rule 12 Order *passim*. For example, in its earlier order, this court determined that Georgia law ought to be applied to the breach-of-contract and accounting claims due to the choice-of-law provision contained in the Agreement. *Id*. at 16. However, choice-of-law provisions in a contract do not control the preliminary question of contract formation, which necessarily demands an independent inquiry as to the applicable law. *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 661 n.9 (10th Cir. 2006) (referring to "the logical flaw inherent in applying a contractual choice of law provision before determining whether the underlying contract is valid"); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."); *Trans-Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1124 (9th Cir. 2008) ("[W]e cannot rely on the choice of law provision until we have decided, as a matter of law, that such a provision was a valid contractual term and was legitimately incorporated into the parties' contract."); *accord Edminster, Hinshaw, Russ & Assocs. v. Downe Twp.*, 953 F.3d 348, 351 (5th Cir. 2020).

Here, Mr. Brown and IFJ raise questions regarding whether a contract was formed in the first place, and whether the Agreement constitutes a valid and enforceable contract. Because the court seeks to give maximum effect to the justified expectations of the parties, including as they are expressed in the Agreement (whether it represents a binding contract or was merely the product of incomplete negotiations), and because the parties' arguments on their motions for summary

judgment assume that Georgia law ought to apply, the court will presume Georgia law applies to the question of contract formation. In doing so, the court takes guidance from the Tenth Circuit, which has previously endorsed a similar party-presentation principle. *See Mullin v. Travelers Indem. Co.*, 541 F.3d 1219, 1222 (10th Cir. 2008) ("Because the parties' arguments rely on Utah law, we will assume that Utah law governs."); *accord St. Anthony Hosp. v. United States HHS*, 309 F.3d 680, 703 (10th Cir. 2002).

        ii)      Whether a contract was formed

"To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." *Ga. Lottery Corp. v. Vasaya*, 353 Ga. App. 52, 55 (2019) (quoting O.C.G.A. § 13-3-1). "An offer and an acceptance are essential prerequisites to the creation of every kind of contract. Thus, the law requires that the parties consent to the formation of a contract. Until each has assented to all the terms, there is no binding contract[.]" *Id*. (quoting *Southeast Grading v. City of Atlanta*, 172 Ga. App. 798, 800 (1984)). Whether the parties intended to make a contract is a question of fact. *Frey v. Friendly Motors, Inc.*, 129 Ga. App. 636, 637 (1973); *accord Terry Hunt Constr., Inc. v. AON Risk Servs.*, 272 Ga. App. 547, 551 (2005).

In Georgia, as elsewhere in the Anglo-American tradition of contracts, "[a]ssent to the terms of a contract may be given other than by signatures." *Del Lago Ventures, Inc. v. QuikTrip Corp.*, 330 Ga. App. 138, 144 (2014) (quoting *Cochran v. Eason*, 227 Ga. 316, 318 (1971)). Thus, contrary to IFJ's argument, it is not true that "[a] valid written contract in Georgia requires signature and delivery of the executed contract." Defs.' Opp'n Mem. at 30.

Under the common law of contracts in the State of Georgia, a "contract may arise through a course of conduct and mutual acquiescence in such course of conduct may constitute sufficient

9

consideration for that contract." *Netsoft Assocs., Inc. v. Flairsoft, Ltd.*, 331 Ga. App. 360, 363 (2015) (quoting *Reynolds v. Long*, 115 Ga. App. 182, 184 (1967)); *accord Groves v. Gibbs*, 367 Ga. App. 730, 734 (2023); *Cooper v. G. E. Constr. Co.*, 116 Ga. App. 690, 694 (1967) ("If one of the parties has not signed, his acceptance is inferred from a performance under the contract, in part or in full, and he becomes bound.").

> [When] determining if parties had the mutual assent or meeting of the minds necessary to reach agreement, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent. In some instances, the only conduct of the parties manifesting intent is the express language of the agreement. In other instances, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement, and courts are free to consider such extrinsic evidence.

*Hunter v. Lowndes Cty. Health Servs.*, LLC, 355 Ga. App. 367, 369-70 (2020) (citations omitted).

However, "an offer may be accepted either by a promise to do the thing contemplated therein, or by the actual doing of the thing." *Groves v. Gibbs*, 367 Ga. App. at 734. Because "an offeror is the master of his or her offer, and free to set the terms thereof," *Grange Mut. Cas. Co. v. Woodard*, 300 Ga. 848, 853 (2017), offerors may determine the appropriate means of accepting the offer itself and thus cabin the objective-intent analysis to be conducted by the finder of fact.

As a result, if an offeror, in the terms of the offer, demands acceptance through signature and delivery of the contract, for example, no contract is formed until the offeror-defined terms of acceptance are satisfied.[3] *MAPEI Corp. v. Prosser*, 328 Ga. App. 81, 84 (2014) (citing *Clarke Bros.*

---

[3] Mr. Brown and IFJ conflate the argument that signature and delivery are *default rules* under Georgia law with the argument that they are *optional rules* that can be opted into by offerors. However, this distinction is significant. It does not follow from the simple truth that an offeror *can*

*v. McNatt*, 132 Ga. 610, 614 (1909)) ("A contract that is intended to be signed by both parties, and so appears on its face, is complete when thus signed.").

But whether a contract is intended to be signed by both parties—or whether the parties intend that a contract only become effective upon signature—is informed by much more than whether a contract simply contains signature blocks. *See Cobra Tactical, Inc. v. Payment All. Int'l Inc.*, 315 F. Supp. 3d 1342, 1347 (N.D. Ga. 2018) ("[T]he mere fact that a contract contains signature blocks does not mean that signature is required to make the contract effective."). For example, in *Clarke Bros.*, the contract-at-suit "contain[ed] some indication" that one of the parties "should have signed it." 132 Ga. at 614. Nevertheless, because both parties "ha[d] acted under the instrument," the Georgia Supreme Court determined that it was not clear "that both vendor and vendees intended to sign the contract before it should become effective." *Id.*

Similarly, in *Burson v. Milton Hall Surgical Assocs., LLC*, the Georgia Court of Appeals held that a written contract between parties—even though it contained language indicating that "the parties executed [the] agreement" and included signature blocks for all parties—was effective upon the parties' performance under the contract, in part or full, even though one party did not sign. 343 Ga. App. 159, 167 (2017); *accord Del Lago Ventures*, 330 Ga. App. at 144.

### *The Agreement did not mandate signature and delivery.*

Because mandatory signature and delivery is not a default rule for contract formation under the law of Georgia, and because the inclusion of signature blocks or the inclusion of the term "executed," per *Burson*, did not mandate signature and delivery, Mr. Brown and IFJ assert another

---

*demand* signature and delivery before being bound by the terms of his offer that "[a] valid written contract in Georgia *requires* signature and delivery[.]" Defs.' Mot. at 26 (emphasis added).

line of defense—namely, that the terms of the offer expressly conditioned acceptance of its terms upon signature and delivery. Mr. Brown and IFJ argue that the terms of the Agreement demanded delivery as a prerequisite to formation because the signature page of the Agreement states "DULY EXECUTED and delivered by the undersigned Members" above the signature blocks. *See* Agreement at 12; Defs.' Mot. at 11, ¶ 69. Mr. Brown and IFJ reason that this language—as part of the *offer*—conditioned acceptance upon signature and delivery of the contract by all parties.

Although the construction of the terms of contracts themselves may, in some cases of ambiguity, be a question for the jury, *Woody's Steaks, LLC v. Pastoria*, 261 Ga. App. 815, 817 (2003), "[t]he interpretation of an *offer* [] is an issue of law for a court." *First Acceptance Ins. Co. of Ga. v. Hughes*, 305 Ga. 489, 493 (2019) (emphasis added) (citing *Weill v. Brown*, 197 Ga. 328, 332 (1944) (a court determines "just what [an offer] means," and, if an offer is too indefinite for a court to so determine, there can be no assent thereto); *Herring v. Dunning*, 213 Ga. App. 695, 697 (1994) (a court decides the meaning of a settlement offer)).[4]

The court determines as a matter of law that "the most reasonable construction," *Hughes*, 305 Ga. at 495, of the terms of the offer, particularly when construed against the interests of the drafting party, *id*. (citing *Stewart v. Finance Co. of the South*, 49 Ga. App. 462 (1934) (any ambiguities in offer letter should be construed against the drafter), did not condition acceptance upon signature and delivery. Mere inclusion of the term "delivered" above the signature block, in the indicative mood, did not condition acceptance upon delivery. Regardless of whether reading

---

[4] Although the *Hughes* court continued to outline the three-step process for interpreting contractual terms in the following paragraph, 305 Ga. 493-94, it appears to ultimately construe the terms of the *offer* as a matter of law, searching for "the most reasonable construction" of the offer, rather than searching for triable ambiguity. *Id*. at 495.

such condition might be a reasonable interpretation of the terms of the offer, it is not, as a matter of law, the most reasonable construction. Conditioning acceptance on signature demands more.

In reaching this conclusion, the court reiterates the Georgia courts' statements in *Burson* and *Clarke Bros.*, and further points to the Georgia Supreme Court's decision in *Cochran v. Eason*, 227 Ga. 316. There, that court held that, even where a contract stated that an "agreement shall be binding on all the parties hereto, their heirs, successors and assigns *when each of the parties hereto shall have signed* one of the counterpart originals of this agreement," *id.* at 317 (emphasis added), evidence of assent could be adduced from party conduct and other terms of the contract, "even assuming that the foregoing language should ordinarily be construed to require such signatures in order to be binding." *Id.* at 318.

The *Cochran* court declined to read the offer, as a matter of law, as conditioning acceptance upon signature. Instead, it determined that a reasonable jury could find that other evidence could support a finding of assent to the terms of the agreement and, therefore, formation. Because the contract-at-suit in *Cochran* was not interpreted as imposing a condition on the acceptance of the offer, even given much more particular language, this court declines to interpret the term "delivered," offered in the indicative mood above the signature blocks, as mandating delivery of the contract under the terms of the offer.

### Boulder Falcon's course of conduct could show assent to the terms of the offer.

Because the terms of the offer do not condition acceptance upon signature and delivery and the offeror did not sufficiently exercise any mastery over the offer in such a way as to constrain the manner of acceptance, the court next considers whether, under an objective-intent theory, the evidence presented gives rise to a genuine dispute as to whether Boulder Falcon manifested its assent to the Agreement. Here, Boulder Falcon has produced sufficient admissible evidence to

support a finding by the fact-finder that its conduct did, in fact, demonstrate such an objective intent.[5]

In particular, Boulder Falcon's apparent payment of 74.5% of the Aircraft's operating expenses and the "One Month Reserve Fixed Expenses Deposit" among other sums, following the effective date of the contract, could provide the evidentiary basis for a jury to conclude that Boulder Falcon exhibited the objective intent to be bound by the terms of the Agreement. ECF No. 142-4 (filed under seal); Pl.'s Opp. Mot. at 45; Pl.'s Mot. at 20; Pl.'s Reply Mem. at 8. This performance alone—whether partial or perfect—creates a genuine dispute of material fact as to whether the contract was formed, and the court thus declines to enter summary judgment on Mr. Brown's and IFJ's behalf.

Mr. Brown and IFJ argue that Boulder Falcon's assent-by-payment should be disregarded because such conduct began before all terms of the Agreement were settled and written. Defs.' Opp'n Mem. at 20, 33. Because Boulder Falcon began paying invoices according to the Agreement's payment schedule just over a week before Geyer requested a change to the Agreement and before the Agreement was signed by IFJ and Geyer, Mr. Brown and IFJ argue that "Boulder cannot rely on its payment of 74.5% proportional share to evidence its intent to be bound by the alleged Agreement." *Id.* at 33. But this is a somewhat rococo argument—the Agreement itself indicated that was effective as of March 2021, before the first payment of 74.5% by Boulder Falcon, and IFJ itself sent the invoice expecting payment under the Agreement.

---

[5] This is true even where such performance is imperfect—for example, where Boulder Falcon paid IFJ's invoices in which it overcharged Boulder Falcon by about thirty dollars. *See* Defs.' Opp'n Mem. at 37. As stated above, a jury does not need to be provided evidence of perfect performance to reasonably conclude that a meeting of the minds occurred.

14

In any case, Mr. Brown and IFJ simply err in arguing that Boulder Falcon's payment of IFJ's invoices before Geyer's request (but nonetheless in accordance with the terms of the Agreement, including under its effective date, and in response to IFJ's invoice) could not manifest an intent to be bound under the terms of the Agreement. Defs.' Opp'n Mem. at 20, 36-38. In simple terms, IFJ's continued transmission of invoices according to the Agreement payment schedule, and Boulder Falcon's continued payment of the same, could be evidence of an intent to be bound by the terms of the Agreement, even as modified subsequent to Geyer's request.

Continued payment could therefore be found by a reasonable jury to signify acquiescence to the modified terms and a meeting of the minds that the Agreement was, in fact, binding. That Boulder Falcon began paying (according to IFJ's request) and subsequently continued to pay even after the Geyer correspondence cannot reasonably be refashioned into a cudgel to bash these permissible evidentiary inferences out of shape. While Mr. Brown and IFJ will be entitled to argue that the *weight* of the evidence supports their argument that there was an inadequate meeting of the minds, they do not successfully argue that Boulder Falcon's continued payment according to the terms of the Agreement somehow negates an intent to be bound thereby. Once "all the terms" were in place, *Southeast Grading*, 172 Ga. App. at 800, Boulder Falcon's continued payment according to the schedule could have evidenced an objective intent to be bound by the terms of the Agreement.[6]

---

[6] That Boulder Falcon "question[ed] the need to sign" the new version following the Geyer correspondence, Defs.' Opp'n Mem. at 39, does not only give rise to an inference that "Boulder Falcon rejected" any "counteroffer." *Id*. It might also follow from the non-signature that Boulder Falcon questioned the need to sign the new document because it believed it was *already bound*, including by performance. Rather than weigh these inferences for itself, the court will leave this work to the jury upon presentation and argument of the competing inferences by the parties.

While Mr. Brown and IFJ err in arguing that the Geyer correspondence blew up the possibility of contract formation altogether, it certainly created an issue regarding whether Boulder Falcon's continued transmission of funds according to the Agreement after the Geyer amendment signified an intent to be bound by the terms of the final Agreement once all the terms were in place. Thus, there is a genuine dispute of fact, *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999), as to whether Boulder Falcon manifested an objective intent to be bound by the terms of the Agreement *once all terms were in place* (including through its failure to sign the Agreement following the Geyer correspondence, notwithstanding IFJ's requests, as mentioned above, Defs.' Opp'n Mem. at 31; ECF No. 163-2).[7]

The court therefore denies Boulder Falcon's request for summary judgment on the formation question for the same reasons it denies Mr. Brown and IFJ' motion on the issue: the

---

[7] The court notes that Mr. Brown's and IFJ's opposition memorandum, without explanation, pivots from one section to the next between arguing that "all the terms" must be in place and that only "material terms" must be in place. *See* Defs.' Opp'n Mem. at 39. In fairness, Georgia courts have toggled between demanding that "all the terms" of a contract must be in place before assent can be found, *e.g., Southeast Grading*, 172 Ga. App. at 800; O.C.G.A. § 13-3-2, and demanding only "material terms." *E.g., Kitchen v. Insuramerica Corp.*, 296 Ga. App. 739, 743 (2009); *Aukerman v. Witmer*, 256 Ga. App. 211, 214 (2002).

Assuming, *arguendo*, that this court must search only for material terms, the court concludes that the term at issue in the Geyer correspondence was not, in fact, material. Generally, "material terms" include subject matter, quantity, and duration, so that the promises and performance to be rendered by each party are reasonably certain. 17A AM. JUR. 2D CONTRACTS § 190 (2004); *accord* J.D. CALAMARI & J. PERILLO, THE LAW OF CONTRACTS, § 2-13, at 43-44 & n. 17 (2d ed. 1977). The material terms are in place when "the contract provides a sufficient basis for determining whether a breach has occurred and for identifying an appropriate remedy." *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990) (citing Restatement (Second) of Contract § 33 (1981)).

Ultimately, however, this distinction is irrelevant here. Either all material terms were in place because the Geyer alterations were immaterial *or*, alternatively, Boulder Falcon's continued payment according to the Agreement payment schedule after the Geyer alterations were made could sufficiently manifest an objective intent to be bound by the Agreement once "all the terms" were in place.

court elects to leave to the wisdom of the jury, following the "ceremony of trial," *Richard v. Firestone Tire & Rubber Co.*, 853 F.2d 1258, 1263 (5th Cir. 1988); *Palmer v. Valdez*, 560 F.3d 965, 969 n.4 (9th Cir. 2009), the question of whether a contract was formed.

In the next two subsections, the court considers whether Boulder Falcon has successfully raised a genuine dispute as to material facts concerning breach. To do so, the court begins by construing contract terms to determine what facts would be material for a showing of breach.

Under Georgia law,

the construction of contracts involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

*Woody's Steaks*, 261 Ga. App. at 817.

The existence or nonexistence of an ambiguity is a question of law for the court. *Se. Atl. Cargo Operators v. First State Ins. Co.*, 197 Ga. App. 371, 372 (1990). If the court determines that an ambiguity exists, however, a jury question does not automatically arise. Rather, the court must first attempt to resolve the ambiguity by applying the rules of construction in O.C.G.A. § 13-2-2. "It is only when the ambiguity remains after the statutory rules have been applied that the issue becomes one for the jury." *First State Ins. Co.*, 197 Ga. App. at 372.

Ambiguity, in turn, is defined as "duplicity, indistinctness, an uncertainty of meaning or expression used in a written instrument, and . . . also signifies [] doubtful or uncertain nature; wanting clearness or definiteness; difficult[y] to comprehend or distinguish; [being] of doubtful purport; open[ness] to various interpretations." *Early v. Kent*, 215 Ga. 49, 50 (1959) (quoting

*Novelty Hat Mfg. Co. v. Wiseberg*, 126 Ga. 800, 801, 55 S.E. 923, 924 (1906)) (internal quotation marks omitted).

      iii)      Whether the contract precludes recovery for damages

Assuming that a contract was formed, Mr. Brown and IFJ argue in the alternative that "Boulder waived the right to recover damages for breach of contract." Defs.' Mot. at 27-28. In support, Mr. Brown and IFJ rely on section eight of the Agreement, titled "Exculpation and Indemnification." Specifically, they point to a sentence fragment declaring that "no Member or Officer will be personally liable to the Group, any Member, or any other person for monetary damages for any act or omission of a Manager or Officer to the Group, any Member or any other person." Defs.' Mot. at 28.

However, Mr. Brown's and IFJ's argument as to section eight is unavailing. Mr. Brown and IFJ ignore the first line of that section, excepting from that indemnification clause damages arising "by reason of a breach under this Agreement." Agreement § 8. Thus, the plain language of the Agreement unambiguously reserves parties' rights to seek damages for breach of contract, and Mr. Brown's and IFJ's proposed interpretation of the contractual language is unreasonable as a matter of law.

      iv)      Whether Defendants breached

Mr. Brown and IFJ next argue that Boulder Falcon has failed to create a genuine dispute as to any material fact of breach on the part of Mr. Brown and IFJ. Defs.' Mot. at 29.[8] For the sake of

---

[8] Generally, "[t]he elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Norton v. Budget Rent a Car Sys.*, 307 Ga. App. 501, 502 (2010).

simplicity, the court will follow Mr. Brown's and IFJ's election to break Boulder Falcon's twenty-four alleged breaches pleaded into nine categories or families of breach theories.

### a.  Ownership

The first bucket of Boulder Falcon's breach allegations generally regards issues of ownership of the Aircraft. These breach allegations, styled as allegations (a), (b), (d), (e), (f), and (g), include that

> (a) Defendants failed to perfect the Group's ownership of the Aircraft, in violation of Section 1 of the Agreement;
> (b) Defendants failed to file documents, including the Agreement, with the FAA;
> (d) Defendants failed to register the Aircraft on behalf of the Group;
> (e) Defendants orchestrated a sale of the Aircraft to benefit themselves and to the detriment of Boulder Falcon;
> (f) Defendants failed to give notice and obtain unanimous consent for the disposition of the Aircraft; and
> (g) Defendants intentionally defaulted on its obligations to Falcon Group IV.

SAC ¶ 102.

Mr. Brown and IFJ defend against these breach allegations by arguing that, because "the alleged Agreement did not and could not vest Boulder with title to the Jet," these claims must fail. Defs.' Mot. at 28-29. But Mr. Brown's and IFJ's arguments are off-point.

The Agreement, and Boulder Falcon's breach allegations thereunder, do not depend upon either IFJ or Boulder Falcon *owning* the Aircraft in a traditional sense—the sense that one might consider in a first-year course on property law. Instead, through the Agreement, the parties made certain representations and promises to each other in exchange for counter-promises. Breach of these promises, alone and by itself, gives rise to a claim for breach of contract. Contract law assumes—indeed, totally depends on the assumption—that parties "may impose on themselves obligations where none existed before." CHARLES FRIED, CONTRACT AS PROMISE 1 (1981).

It is undisputed that IFJ, at the time of the execution of the Agreement, was a legal lessee of the Aircraft. IFJ has failed to establish that, as a result, it could not validly assign or contract away its lease rights to the Aircraft under its own lease agreement with Falcon Group IV. As a result, when IFJ came to the bargaining table with Boulder Falcon and Geyer, it came with a legitimate set of rights and entitlements concerning the Aircraft that it could exchange for consideration. It certainly cannot now claim that it never had any bargaining chips to begin with.

Further, even if IFJ lacked any legal claim to the Aircraft when the Agreement was executed, that would not necessarily defeat Boulder Falcon's contract claim. Even if a party does not own some property prior to entering into a contract, it can nonetheless promise to come into ownership and possession of the property and be liable for breach if it fails to do so. *E.g.*, *Jennings v. Realty Developers, Inc.*, 171 S.E.2d 829 (Va. 1970). Mr. Brown's and IFJ's argument that they are entitled to summary judgment on breach theories (a), (b), (d), (e), (f), and (g), premised on their contention that the Agreement could not be breached unless Boulder Falcon held title to the Aircraft thus fails.

Mr. Brown and IFJ further argue that "Boulder has not alleged any damages that resulted from the alleged failures[.]" Defs.' Mot. at 30. But this is not true. Boulder Falcon does allege damages for breach of the Agreement. *See* SAC ¶ 104. And while it is true that "[i]n a suit for damages for breach of contract, the plaintiff must allege and prove both the breach and the damage," *Corrosion Control, Inc. v. William Armstrong Smith Co.*, 157 Ga. App. 291, 292 (1981), "[i]n every breach of contract the injured party has a right to damages, and if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action." *Brock v. King*, 279 Ga. App. 335, 341 (2006) (quoting *Botterbusch v. Preussag Intl. Steel Corp.*, 271 Ga. App. 190, 195 (2004)).

20

The Georgia Court of Appeals has recently reaffirmed that "[b]ecause 'the lack of evidence regarding the actual amount of damages is not dispositive on a motion for summary judgment in a breach of contract case,'" a plaintiff is not precluded from recovering nominal damages, and a trial court errs in granting summary judgment on such basis. *Dataforensics, LLC v. Boxer Prop. Mgmt.*, 361 Ga. App. 311, 321 (2021) (quoting *6428 Church Street, LLC v. SM Corrigan, LLC*, 352 Ga. App. 437, 444 (2019). Thus, summary judgment on the basis of any deficiency in alleging or showing damages at this stage is not warranted.

b.   Alleged failure to make payments

The next class of alleged breaches—consisting of breach theories (c), (g), and (i), relate to Mr. Brown's and IFJ's alleged failure to service the existing loan payments IFJ owed to Falcon Group IV. Mr. Brown and IFJ argue that "[t]here is no genuine dispute of material fact that Boulder's refusal to pay its share of expenses caused IFJ to default on payments to Falcon Group IV," Defs.' Mot. at 30-31, resulting in a breach.

The court is not persuaded. There exists a genuine dispute as to whether Boulder Falcon's refusal to pay was the cause of the default or whether IFJ had sufficient funds to otherwise service the loan. "Questions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." *Knight v. Roberts*, 316 Ga. App. 599, 604 (2012) (quoting *Walker v. Giles*, 276 Ga. App. 632, 639 (2005)).

c.   Alleged failure to keep accurate records

Defendants' motion for summary judgment groups breach theories (h) and (x) together and asserts an entitlement to summary judgment on the grounds that "Boulder does not claim any damages related to IFJ's alleged failure to keep accurate books and records." Defs.' Mot. at 31. However, for the reasons stated above in relation to Mr. Brown's and IFJ's breach theories related

21

to ownership, this is not a proper ground for the entry of summary judgment, and Defendants' motion on the point thus fails.

d. Geyer's withdrawal

Regarding the cluster of breach theories—(j), (k), (l), (n), and (v)—relating to Geyer's withdrawal from the Agreement group, Mr. Brown and IFJ offer a number of reasons they argue they are entitled to summary judgment. First, Mr. Brown and IFJ argue that a breach theory based on Geyer's withdrawal does not lie because the face of the Agreement states that "[n]o Member may withdraw without the consent of the other Members." Agreement § 3(b).

But it is unclear whether this provision—even when read in conjunction with the transfer limitations set out in section nine—stands for the proposition that Members *cannot* withdraw, or that they are *prohibited* from doing so as a matter of contractual promise.[9] While the court declines to unnecessarily probe conceptual issues stemming from this provision (or Boulder Falcon's breach theories based on the same), it suffices to say that Mr. Brown and IFJ have failed to demonstrate an entitlement to summary judgment on any breach theories under this line of argument.

Second, Mr. Brown and IFJ argue that, as to breach theory (k), IFJ did in fact give Boulder Falcon the purchase option to which it was entitled under section 9(c) of the Agreement. This is based primarily on Mr. Brown's and IFJ's contention that "[Mr.] Vitek expressed an interest in purchasing the Jet," Defs.' Mot. at 32, and that IFJ invoiced Boulder Falcon for 99% of expenses

---

[9] Similarly, the court understands that if the contract was not formed in the first place, Geyer's withdrawal from the arrangement would be properly understood as the withdrawal of an *offer*. Thus, even assuming Geyer acted so as to withdraw, whether such actions withdrew the offer or constituted withdrawal from the arrangement in apparent contravention of the Agreement ultimately turns on a jury's determination as to whether the contract was formed in the first place.

as a result. However, a reasonable jury could conclude that IFJ's election to invoice Boulder Falcon for 99% of expenses was, rather than a purchase option under the Agreement, "an accounting mistake," Pl.'s Opp'n Mem. at 13, as represented in IFJ's 30(b)(6) deposition. *Id*.

Third, that "Boulder was not damaged by Geyer Aviation's purported withdrawal," Defs.' Mot. at 32, is not grounds for summary judgment for the reasons stated above in relation to the other breach theories.

### e.   Change of the Aircraft's home base

Next, Mr. Brown and IFJ argue that Boulder Falcon "has not produced any evidence that IFJ intended the move [of the Aircraft] to Georgia to be permanent," Defs.' Mot. at 33, and that, as a result, all breach theories related to the Agreement's prohibition on changing the Aircraft's home base without consent (i.e., theories (m), (n), (t), and (u)) must fail. *Id*. Mr. Brown and IFJ also point to the fact that the Aircraft had only been removed from the home base for twelve days when this action was commenced. *Id*.

However, evidence that Mr. Brown and IFJ moved the Aircraft without indicating when it would be returned to the home base, failed to pay hangar fees at the home base, and subsequently defaulted on the lease would provide sufficient basis for a jury to find that Mr. Brown and IFJ effectively changed the Aircraft's home base in violation of the Agreement. Pl.'s Opp'n Mem. at 51. While the court declines to weigh the evidence or competing inferences to be drawn therefrom, it is satisfied that reasonable jurors could disagree as to breach under this family of claims, and that summary judgment is inappropriate as a result.

### f.   Alleged self-dealing

As to breach theories (r) and (s), Mr. Brown and IFJ argue that they are entitled to summary judgment because they informed Boulder Falcon that they would use "our maintenance staff in

Atlanta" to conduct repairs, and that IFJ thus did not conceal its relationship with the maintenance group at issue. Defs.' Mot. at 34. However, IFJ's statement (at least to Boulder Falcon) that it would use "our maintenance staff in Atlanta" could be understood by a reasonable jury to fail to disclose the nature of the transaction or IFJ's relationship with the maintenance group.

A reasonable jury could find that, in the absence of clearer disclosure of the relationship (given the vagueness and ambiguity of the term "our"), no approval for the otherwise-prohibited transaction was given as required under the Agreement. Further, IFJ does not suggest that there is a genuine dispute as to Geyer's failure to approve the repairs, which approval would have been mandated under the terms of the Agreement.

### g.   Expenses in excess of $25,000

For the reasons set out above regarding a breach-of-contract plaintiff's burden as to damages, Mr. Brown's and IFJ's argument that Boulder Falcon was not damaged by IFJ's breach of the Agreement's prohibition on certain expenses without member approval, Defs.' Mot. at 34, fails.

### h.   IFJ's payments

Finally, Mr. Brown and IFJ move for summary judgment as to breach theory (w), alleging that IFJ failed to pay "its share of expenses under Section 13 [of the Agreement]." SAC ¶ 102(w). Mr. Brown and IFJ argue that "Boulder has presented no evidence that IFJ failed to pay its share of expenses." Defs.' Mot. at 35. However, there is no dispute that IFJ did, eventually, stop making payments required by section 13 of the Agreement. IFJ may argue, for example, that this was excused by a material breach by Boulder Falcon. However, a question of fact for the jury would nonetheless remain, *See Don Swann Sales Corp. v. Parr*, 189 Ga. App. 222, 225 (1988), and summary judgment is inappropriate as to breach theory (w) as a result.

### B. Mr. Brown's Personal Liability

Mr. Brown and IFJ move for summary judgment as to Mr. Brown "because IFJ is not liable to Boulder" for any of the substantive counts. Defs.' Mot. at 37. However, because Mr. Brown's and IFJ's motion for summary judgment on the substantive counts fails, and because they offer no independent argument regarding a separate entitlement as to summary judgment for Mr. Brown, summary judgment is inappropriate.

### C. Entitlement to Specific Performance

Mr. Brown and IFJ move for summary judgment as to Boulder Falcon's second claim for relief, which is styled as a claim for specific performance. But "specific performance" is not so much a cause of action as it is a remedy or remedial theory in equity. *See Black v. Am. Vending Co.*, 239 Ga. 632, 633 (1977). In any case, "[a]s a general rule, equity will not decree specific performance of contracts relating to personal property. In order to sustain a bill for the specific performance of such a contract, it is necessary to allege some good reason in equity and good conscience to take the case out of the general rule above stated." *Id*. The trial court must, before ordering such a remedy at equity, enter facts sufficient to support such a conclusion. *Id*. at 634.

Mr. Brown and IFJ have demonstrated the absence of any genuine dispute as to facts material to the propriety of specific performance in equity. And Mr. Brown and IFJ are correct, *see* Defs.' Reply Mem. at 27, that Boulder Falcon failed to point to any genuine disputes as to material facts as to this (remedial) "part" of its breach claim. *See* Fed. R. Civ. P. 56(a). Thus, Mr. Brown and IFJ have demonstrated that Boulder Falcon shall not be entitled to invoke this court's power in equity to order specific performance of the Agreement.

25

### D. Conversion

Boulder Falcon's fourth cause of action is conversion. SAC ¶¶ 118-30. As discussed above, a previous order of this court determined that the common law of Utah is to be applied to Boulder Falcon's conversion claim. Rule 12 Order at 9. Mr. Brown and IFJ cursorily argue that they are entitled to summary judgment on Boulder Falcon's conversion claim because "the alleged Agreement could not and did not transfer title [to the Aircraft] to Boulder[.]" Defs.' Mot. at 35. However, Mr. Brown and IFJ misunderstand the threshold question at issue under a claim for conversion.

Under Utah law, "conversion is an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession." *Fibro Tr., Inc. v. Brahman Fin., Inc.*, 1999 UT 13, ¶ 20, 974 P.2d 288 (quoting *Allred v. Hinkley*, 8 Utah 2d 73, 76, 328 P.2d 726). Contrary to Mr. Brown's and IFJ's characterization of the cause of action, "[c]onversion is concerned with possession, not title." *Id.* (quoting 18 AM. JUR. 2D CONVERSION § 75 (1985)). As a result, a conversion plaintiff need not show that he possessed title to the chattel, but must instead only show "that he or she is entitled to immediate possession of the property at the time of the alleged conversion." *Id.* (citing *Benton v. Utah Div. of State Lands & Forestry*, 709 P.2d 362, 365 (Utah 1985)).

Boulder Falcon certainly could have obtained an immediate present possessory right from IFJ, lessee of the Aircraft, of which immediate present possessory right it could have been deprived through Mr. Brown's and IFJ's actions. Because Mr. Brown and IFJ failed to demonstrate the absence any genuine dispute as to facts material to the conversion claim, *Celotex Corp.*, 477 U.S. at 322-23, the court declines to enter summary judgment on their behalf.

26

### E.  Unjust Enrichment

Mr. Brown and IFJ move for summary judgment on Boulder Falcon's unjust enrichment claim because (a) Boulder Falcon was not the owner of the Aircraft, and (b) "[a]n unjust enrichment claim cannot be founded on pass-through payments because IFJ did not receive the benefit of any of those payments." Defs.' Mot. at 36. But Mr. Brown's and IFJ's theory that unjust enrichment relies on claims of title or ownership fails for the reasons set out above. Additionally, Mr. Brown and IFJ fail to meaningfully respond to Boulder Falcon's allegations "that the defendants engaged in self-dealing by funneling payments for unnecessary repairs to a company owned by [Mr.] Brown." Rule 12 Order at 14.

Further, as this court previously explained, "even if the payments merely flowed through the defendants to pay for necessary expenses, the defendants obtained sole possession of an airplane that had been maintained by money paid by Boulder Falcon" and were thus benefitted. *Id*. Because Mr. Brown and IFJ fail to demonstrate the lack of any genuine dispute as to facts material to Boulder Falcon's unjust enrichment claim, they have failed to demonstrate an entitlement to summary judgment.

### F.  Counterclaims

In their motion for partial summary judgment, Mr. Brown and IFJ assert an entitlement to summary judgment on their counterclaims of open account and unjust enrichment.

#### i)    Open Account

Boulder Falcon, in its opposition memorandum, suggests that this court has previously determined that "Utah law should apply to the causes of action that do not arise under the Agreement." Pl.'s Opp'n Mem. at 54. However, the previous order of this court identified by Boulder Falcon clearly states that "the court applies Georgia law to the breach of contract, specific

27

performance, and accounting claims." Rule 12 Order at 16. Thus, for the same reasons that this

court determined that Georgia law ought to apply to Boulder Falcon's accounting claim, it will

similarly apply Georgia law to Mr. Brown's and IFJ's accounting counterclaim.

> Under Georgia law,
>
> [a]n open account is defined as an account which has not been finally settled or
> closed, but is still running or open to future adjustment or liquidation[.] Open
> account, in legal as well as in ordinary language, means an indebtedness subject to
> future adjustment, and which may be reduced or modified by proof.

*Scott v. Prestige Fin. Servs.*, 345 Ga. App. 530, 531 (2018) (quoting *Altacare Corp. v. Decker,*

*Hallman, Barber & Briggs, P.C.*, 316 Ga. App. 718, 719 (2012)). Similarly,

> [a] suit on open account is available as a simplified procedure to the provider of
> goods and services where the price of such goods or services has been agreed upon
> and where it appears that *the plaintiff has fully performed its part of the agreement
> and nothing remains to be done except for the other party to make payment.*

*Id*. (emphasis added).

"[N]onpayment of the account is the only issue that is to be considered in a suit on account."

*Id*. at 532 (citation omitted). "When there exists a bona fide dispute as to the amount due or the

receipt of goods, open account is the wrong theory of recovery because such simplified action is

for cases where a party seeks to recover what he justly and equitably is entitled to without regard

to any special agreement as to payment." *Id*. (citing *Zampatti v. Tradebank Intl. Franchising Corp.*,

235 Ga. App. 333, 343-344 (1998)).

Here, however, Mr. Brown and IFJ have failed to demonstrate that they have fully

performed their part of the Agreement, even assuming that the Agreement is the *type* of transaction

under which an open account claim would otherwise be appropriate. Contrary to Mr. Brown's and

IFJ's characterization of the Agreement, IFJ was obliged to do more than simply "provid[e]

Boulder access to the Jet." Defs.' Mot. at 39. Instead, a genuine dispute as to the fact of Mr.

Brown's and IFJ's breach remains for the jury, and summary judgment on behalf of Mr. Brown and IFJ as counterclaim plaintiffs is therefore inappropriate.

          ii)     Unjust Enrichment

As to Mr. Brown's and IFJ's unjust enrichment counterclaim, the court applies Utah law, largely for the same reasons that Utah law applies to Boulder Falcon's claim under the same cause of action. *See* Rule 12 Order at 13-14. Under Utah law,

> [u]njust enrichment occurs whenever a person has and retains money or benefits that in justice and equity belong to another. Thus, in order for a claim based on unjust enrichment to be successful, there must be (1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.

*Berrett v. Stevens*, 690 P.2d 553, 557 (Utah 1984).

"A claim for unjust enrichment is an action brought in restitution, and a prerequisite for recovery on an unjust enrichment theory is the absence of an enforceable contract governing the rights and obligations of the parties relating to the conduct at issue." *Espinoza v. Gold Cross Servs.*, 2010 UT App 151, ¶ 10, 234 P.3d 156 (quoting *Ashby v. Ashby*, 2010 UT 7, P 14, 227 P.3d 246).

Here, a genuine dispute exists as to whether an enforceable contract was entered into that effectively governs the parties' rights and expectations under transactions related to the Aircraft. Because the question of the existence of such a contract is yet outstanding, the court determines that it would be inappropriate to grant the Mr. Brown and IFJ summary judgment on the unjust enrichment counterclaim.

## II.    Plaintiff Boulder Falcon's Motion

Through its motion, Boulder Falcon first moves this court to declare that the Agreement is legally valid and enforceable. Pl.'s Mot. at 2. However, for the reasons laid out at length above in

relation to Mr. Brown's and IFJ's motion for summary judgment on Boulder Falcon's breach-of-contract claim, Boulder Falcon's motion on this issue is denied, as the court has determined that the issue of whether a contract was formed under Georgia law is a triable jury question. In addition, Boulder Falcon seeks summary judgment as to Boulder Ventures and Mr. Vitek individually on all claims under the theories outlined below, and as to Boulder Falcon, Boulder Ventures, and Mr. Vitek on counterclaim six. *Id.* at 3.

### A.  Breach of Contract (as to Boulder Ventures and Mr. Vitek)

Boulder Falcon moves for summary judgment on the first counterclaim—pleaded under breach of contract—as to Boulder Ventures and Mr. Vitek on the theory that, as non-signatories to the Agreement, they cannot be held liable for breach of the Agreement. Pl.'s Mot. at 22-23. However, Boulder Falcon errs as a matter of law. As this court previously explained in its Rule 12 Order, while it is generally true that only parties to a contract are liable for its breach, traditional principles of law allow a contract to be enforced by or against nonparties through, among other things, a theory of alter ego. *See* Rule 12 Order at 17.

Both parties attempt to style "alter ego" as stand-alone claims, thereby evidencing a misunderstanding as to the nature of the theory of alter ego. Alter ego is not a claim for substantive relief, but rather a remedial theory in equity under which the corporate entity is disregarded and individuals or entities are held liable on the obligations of the corporation, including those obligations arising from breach of contract. *See Bushnell v. Barker*, 2012 UT 20, ¶ 13, 274 P.3d 968.[10]

---

[10] Because Boulder Falcon is incorporated in Utah, Utah law is properly applied to the question of whether the corporate form is properly disregarded. *See* Rule 12 Order at 16.

While the court discusses the issue of whether sufficient factual evidence has been adduced for the invocation of the theory of alter ego below, Boulder Falcon errs in maintaining that Boulder Ventures and Mr. Vitek could not face recovery liability under Mr. Brown's and IFJ's counterclaim for breach of contract. Thus, the court declines to dismiss that counterclaim as to those defendants but will weigh the propriety of entering summary judgment for want of a genuine dispute as to material fact below.

### B. Counterclaims Two through Five (as to Boulder Ventures and Mr. Vitek)

Boulder Falcon next moves for summary judgment on counterclaims two through five as to Boulder Ventures and Mr. Vitek on the grounds that "they are barred by the statute of frauds and the parol evidence rule." Pl.'s Mot. at 23. The court is not persuaded. First, as Boulder Falcon notes, the statute of frauds regulates "every promise to answer for the debt, default, or miscarriage of another." *Id*. (quoting Utah Code Ann. § 25-5-4(1)(a)) (emphasis added).

But the equitable-remedial theory of alter ego is conceptually unrelated from a party's promise to answer for the debt of another. Whether this court may, in its inherent power, fashion an appropriate remedy for legal wrongs by disregarding the corporate form is simply unrelated to the regulation of private parties' promises to one another. Mr. Brown's and IFJ's counterclaim are not premised on the existence of any guaranty agreement. Thus, the issue of whether parties may make guaranty agreements not in writing, and Boulder Falcon's arguments on this issue, are *non sequitur*.

### C. Alter Ego (as a Matter of Fact)

Boulder Falcon's theories related to contractual liability, the statute of frauds, and the parol evidence rule are all unavailing as a matter of law. However, Boulder Falcon also argues that Mr. Brown's and IFJ's alter ego theory fails for want of record evidence. Pl.'s Mot. at 25. While the

court again reiterates that "alter ego" is not a substantive cause of action, it is nonetheless true that, to survive a motion for summary judgment on an alter ego theory, "the party alleging alter ego liability must present evidence creating a genuine issue of disputed material fact with respect to both elements of the *Norman* alter ego test." *Jones & Trevor Mktg. v. Lowry*, 2012 UT 39, ¶ 25, 284 P.3d 630. The two-prong test under *Norman* to determine when the corporate veil may be pierced is as follows:

> (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, viz., the corporation is, in fact, the alter ego of one or a few individuals; and (2) the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow.

*Id.* ¶ 14 (quoting *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979)).

In determining whether summary judgment as to the noncorporate parties is appropriate, the court searches to determine whether a genuine dispute has been raised as to material facts regarding (1) Boulder Falcon's observation of corporate formalities under *Norman* prong one (i.e., the formalities prong), and (2) whether failure to pierce the corporate veil would result in injustice under *Norman* prong two (i.e., the fairness prong). *Id.*[11] Generally, the court notes that, as restated by the Utah Court of Appeals, "[w]hether successor liability and alter ego exist involve questions of fact inappropriate for summary judgment." *Macris & Assocs. v. Neways, Inc.*, 2002 UT App 406, ¶ 21, 60 P.3d 1176.

---

[11] Because piercing the corporate veil is a function of the court's equitable powers, *Jones*, 2012 UT 39 ¶ 20, 284 P.3d 630, the district court will act as the trier of fact for the parties' alter ego theory. *Id.* n.5.

i)   *Norman* prong one

Following *Norman*, the Utah Court of Appeals articulated eight non-exhaustive factors to be considered in determining whether piercing the corporate veil is appropriate—the first seven of which are directed to *Norman* prong one:

> (1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders; and (8) the use of the corporate entity in promoting injustice or fraud.

*Jones*, 2012 UT 39 ¶¶ 16-19, 284 P.3d 630.

Mr. Brown and IFJ assert that they have generated a genuine dispute as to material facts under *Norman* prong one by pointing to Boulder Falcon's alleged undercapitalization. Defs.' Opp'n Mem. at 46. Under Utah law, the adequacy of a corporation's capitalization weighs against both *Norman* prongs, and is measured by the following general principle:

> [S]hareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.

*Salt Lake City Corp. v. James Constructors*, 761 P.2d 42, 47 n.10 (Utah Ct. App. 1988) (quotation omitted).

Mr. Brown and IFJ have raised a genuine dispute as to whether Boulder Falcon's capital is illusory or trifling by adducing evidence that could support a finding that Boulder Falcon relied on Boulder Ventures to finance monthly purchases from its inception (implying a lack of capitalization at formation, *see Lodges at Bear Hollow Condo. Homeowners Ass'n v. Bear Hollow Restoration, LLC*, 2015 UT App 6, ¶ 17, 344 P.3d 145) and relied on loans from Boulder Ventures to meet its obligations to IFJ, which Mr. Brown and IFJ argue could not be paid back based on

33

Boulder Falcon's revenue streams. Defs.' Opp'n Mem. at 46-47. Because the court has found a genuine dispute as to a material fact under *Norman* prong one, it need not consider Mr. Brown's and IFJ's additional arguments under that prong. *See id*. at 48.

    ii)  *Norman* prong two

   The Utah Supreme Court has noted that there are "no factors to analyze under the fairness prong" of *Norman*. *Jones*, 2012 UT 39, ¶ 20 n.6, 284 P.3d 630. And while this court recognizes that it lacks "carte blanche" to make a piercing decision, at this juncture, it searches only for genuine disputes as to material facts under prong two—it need not make a determinative decision as to whether piercing is demanded by the equities.

   Materiality under *Norman* prong two is informed by the high bar courts have imposed, particularly where corporate and alter ego liability stems from consensual market transactions. "Courts have been extraordinarily reluctant to lift the veil in contract cases . . . where the 'creditor has willingly transacted business' with the corporation." *D'Elia v. Rice Dev., Inc.*, 2006 UT App 416, ¶ 28, 147 P.3d 515 (quoting *Perpetual Real Estate Servs., Inc. v. Michaelson Props., Inc.*, 974 F.2d 545, 550 (4th Cir. 1992)); *Centurian Corp. v. Fiberchem, Inc.*, 562 P.2d 1252, 1253 (Utah 1977) (declining to pierce corporate veil and alluding to facts demonstrating defendant entered into contract with plaintiff voluntarily and fully aware of circumstances and risks); 1 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPS. § 41.85 (rev. ed. 1999) (stating that, in general, courts are less likely to pierce the corporate veil in contract cases than in tort cases because the "injured party in contract cases ha[s] the opportunity to select the entity with whom he or she contracted").

   At trial, the court will maintain such a spirit of reluctance to pierce the corporate veil, particularly to remedy defaults created by the parties' arms-length bargaining and contracting.

However, at this juncture, Mr. Brown and IFJ have at least identified a genuine dispute as to a material fact tending to show undercapitalization. Because undercapitalization weighs at *Norman* prong two, it may support a finding by the court as trier of fact that observance of the corporate form would sanction injustice. As a result, the court declines to unnecessarily and prematurely limit its arsenal to fashion an equitable remedy.

### III.    Motion to Exclude Reg Vitek as Expert

Mr. Brown and IFJ, along with their motion for summary judgment, additionally moved this court to exclude portions of the expected testimony of Boulder Falcon's proffered expert witness, Reg Vitek. *See* ECF No. 146. Mr. Brown and IFJ argue that Reg Vitek's expected testimony encroaches into the province of the trial court and would impermissibly instruct the jury on the law at issue. *Id*.

Having reviewed the parties' memoranda filed in conjunction with Mr. Brown's and IFJ's motion to exclude Mr. Vitek, the court concludes that this issue is better resolved at a later time—namely, in anticipation of trial as a motion in limine. Thus, Mr. Brown's and IFJ's motion is **DENIED** without prejudice to refile.

### CONCLUSION

For the foregoing reasons, Defendants Robert Brown's and IFLYAJET, Inc.'s Motion for Partial Summary Judgment, ECF No. 151, is **GRANTED** as to Boulder Falcon's entitlement to specific performance and **DENIED** in all other respects.

Plaintiff and Counterclaim Defendants' Motion for Partial Summary Judgment, ECF No. 142, is **DENIED**.

Additionally, Defendants' Motion to Exclude Expert Testimony of Reg Vitek, ECF No. 146, is **DENIED** without prejudice; Mr. Brown and IFJ may refile this motion as a motion in limine in anticipation of trial.

DATED March 11, 2024.

BY THE COURT

Jill N. Parrish
United States District Court Judge